JAIKUMAR RAMASWAMY
Chief, Asset Forfeiture and
Money Laundering Section (AFMLS)
DANIEL H. CLAMAN, Assistant Deputy Chief
WOO S. LEE, Trial Attorney
STEPHEN A. GIBBONS, Trial Attorney
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530
Telephone: (202) 514-1263
Woo.Lee@usdoj.gov

ANDRÉ BIROTTE, JR.
United States Attorney
STEVEN R. WELK (Cal. Bar No. 149883)
Assistant United States Attorney
Chief, Asset Forfeiture Section
312 North Spring Street, 14th Floor
Los Angeles, California 90012
Telephone: (213) 894-6166
Steven.welk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED
CLERK, U.S. DISTRICT COURT

DEC 1 2 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ONE MICHAEL JACKSON SIGNED THRILLER JACKET AND OTHER MICHAEL JACKSON MEMORABILIA; REAL PROPERTY LOCATED ON SWEETWATER MESA ROAD IN MALIBU, CALIFORNIA; ONE 2011 | No. CV 13-09169 — CAS (AGRx)<br><br>VERIFIED COMPLAINT FOR FORFEITURE<br>*IN REM* |

1

FERRARI 599 GTO,

    Defendants.

Plaintiff United States of America, by and through its undersigned attorneys, in a case of forfeiture *in rem*, alleges that:

## I.

## NATURE OF THE ACTION

1. This is an action *in rem* to forfeit approximately $32 million in real and personal property held for the benefit of Teodoro Nguema Obiang Mangue ("Nguema"), the Second Vice President of Equatorial Guinea ("E.G.") for National Defense and State Security, and the son of the President of E.G. Prior to being appointed Second Vice President, Nguema served as E.G.'s Forestry Minister and Infrastructure Minister. This action seeks forfeiture of property that was derived from violations of U.S. and foreign law pursuant to 18 U.S.C. § 981(a)(1)(C), and property involved in a money laundering offense in violation of 18 U.S.C. §§ 1956 and 1957 pursuant to 18 U.S.C. § 981(a)(1)(A). The defendants *in rem* were obtained through the abuse of public office and illegally laundered through financial institutions and businesses in the United States.

2. The defendant assets described below in paragraphs 7 through 12 are also the subject of <u>United States v. One White Crystal Covered "Bad" Tour Glove et al.</u> (2:11-cv-03582-GW), another civil forfeiture action, pending before this Court. The earlier action was originally filed on April 26, 2011. Although the two actions involve the same defendant assets, the probable cause evidentiary basis for instituting the instant action differs from the earlier filed suit. Furthermore, the instant action alleges additional facts and claims that are based in part upon evidence the United States obtained after the initial suit was filed.

3.  As alleged herein, Nguema exacted millions of dollars in personal payments while serving as E.G.'s Forestry and Infrastructure Minister by soliciting and accepting bribes and extorting forestry companies working in E.G. Nguema took these personal payments in exchange for, among other things, timber export licenses, rights to import equipment into E.G., unfettered and unregulated access to E.G.'s forests, and the ability to continue doing business in E.G.

4.  Additionally, as the cabinet minister responsible for forestry and infrastructure, Nguema misappropriated, embezzled, and stole hundreds of millions of dollars of E.G. public funds by: (i) directing E.G. companies to submit fraudulently inflated "bids" and invoices for government infrastructure contracts that included subcontract payments to Nguema's shell companies for work that was not performed; (ii) obtaining multi-million dollar contracts and payments directly from the E.G. government for work that his shell companies never performed; and (iii) diverting funds from the E.G. government for his personal benefit.

5.  Nguema also used a web of shell companies to carry out and conceal his involvement in corruption and to mask the true sources of his wealth.  Although Nguema represented that his shell companies generated hundreds of millions of dollars in revenue, they served primarily as receptacles for the proceeds of Nguema's corruption.

6.  As a result, despite earning less than $100,000 per year as a public official, Nguema acquired a vast fortune of more than $300 million in assets through these and other acts of corruption.  His accumulation of assets outpaced not only his official salary, but also outstripped even the income he falsely attributed to his shell companies.

///

///

3

## II.

## THE DEFENDANTS IN REM

### A.    One Michael Jackson Signed Thriller Jacket and Other Michael Jackson Memorabilia

7.   The defendant Michael Jackson Signed Thriller Jacket and miscellaneous other Michael Jackson memorabilia (hereinafter "defendant memorabilia" or "defendant Michael Jackson memorabilia") are listed in Attachments A-1, A-2, and A-3 hereto.  Of the defendant Michael Jackson memorabilia listed in Attachments A-1, A-2, and A-3, (i) six Michael Jackson Neverland Ranch Life Sized Statues, described in Attachment A-1, are in the possession of the United States in the Central District of California; (ii) the "We Are the World" Signed Document Archive, described in Attachment A-1, is in the possession of the Government of France; and (iii) the other defendant Michael Jackson memorabilia, listed in Attachments A-1, A-2, and A-3, are believed to be located in E.G.

### B.    Real Property Located on Sweetwater Mesa Road, Malibu, California

8.   The defendant real property, as more fully described in Attachment B hereto, is titled in the name of Sweetwater Malibu, LLC; is located on Sweetwater Mesa Road, Malibu, California, and includes all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom (hereinafter "Sweetwater property" or "defendant real property").[1]

### C.    2011 Ferrari

9.   The defendant 2011 Ferrari is described as follows:  One 2011 Ferrari 599 GTO, VIN ZFF70RCA6B0176109, its tools and appurtenances (hereinafter "defendant 2011 Ferrari").

---

[1]   Pursuant to Local Rule 79-5.4(e), home addresses have been omitted from this complaint.

10. The defendant 2011 Ferrari is titled in the name of Teodoro Nguema Obiang. At present, it is in the possession of the United States.

11. The following may have interests in the defendants *in rem*: Teodoro Nguema Obiang Mangue.

12. The defendant Michael Jackson memorabilia, Sweetwater property, and 2011 Ferrari are collectively referred to as "the defendant assets."

## III.

## JURISDICTION AND VENUE

13. The United States brings this action *in rem* in its own right to forfeit and condemn the defendant assets. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

14. This Court has *in rem* jurisdiction over the defendant assets under 28 U.S.C. § 1355(b).

15. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred in this district. For assets located outside of the United States, venue is also appropriate pursuant to 28 U.S.C. § 1355(b)(2).

16. The defendant real property has not been seized but is located within this district and within the jurisdiction of this Court. The United States does not request authority from the Court to seize the defendant real property at this time. The United States will, as provided by 18 U.S.C. §§ 985(b)(1) and (c)(1):

- Post notice of this action and a copy of the Verified Complaint on the defendant real property;

- Serve notice of this action on the defendant real property's owner, and send such a notice to any other person or entity who has claimed an interest in the defendant real property, along with a copy of this Verified Complaint;

•    If necessary, request and execute a writ of entry for purposes of conducting an inspection and inventory of the defendant real property.

## IV.

## STATUTORY BASIS FOR FORFEITURE

17. The defendant assets are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because they are property constituting or derived from proceeds traceable to an offense constituting a "specified unlawful activity." "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(ii) and (iv) to include, among other things, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official";(iii) foreign offenses involving bribery of a public official; (iv) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (v) receipt of stolen money (18 U.S.C. § 2315).

18. The defendant assets are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or an attempted transaction in violation of 18 U.S.C. § 1957, or are property traceable to such assets. Section 1957 prohibits the conducting of a monetary transaction with property known to be the proceeds of unlawful activity with a value greater than $10,000, i.e., the proceeds of (i) a foreign offense involving extortion; (ii) a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; (iii) a foreign offense involving bribery of a public official; (iv) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); (v) receipt of stolen money (18 U.S.C. § 2315); (vi) domestic bank fraud (18 U.S.C. § 1344); and (vii) making false statements to a financial institution (18 U.S.C. § 1014). *See* 18 U.S.C. §§ 1956(c)(7)(B)(ii), 1956(c)(7)(B)(iv), and 1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

19. The defendant real property and memorabilia are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a transaction or an attempted transaction in violation of 18 U.S.C. § 1956(a)(1)(B), or are property traceable to such assets. Section 1956(a)(1)(B) prohibits the conducting of a financial transaction with property known to be the proceeds of unlawful activity with the intent to conceal the nature, location, source, ownership, or control of proceeds of a specified unlawful activity, i.e., (i) a foreign offense involving extortion; (ii) a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; (iii) a foreign offense involving bribery of a public official; (iv) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); (v) receipt of stolen money (18 U.S.C. § 2315); (vi) domestic bank fraud (18 U.S.C. § 1344); and (vii) making false statements to a financial institution (18 U.S.C. § 1014). *See* 18 U.S.C. §§ 1956(c)(7)(B)(ii), 1956(c)(7)(B)(iv), and 1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

20. The foreign offenses listed above are criminalized under the law of Equatorial Guinea by the following provisions of the Spanish Penal Code in force in 1968, which is the current body of criminal law in E.G.: Article 131 (abuse of public office); Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession or involve oneself in a business directly related to scope of official duties); Articles 200 and 202 (collection of illegal taxes); Article 385 (prohibiting public officials from demanding or accepting bribes to perform a crime); Article 386 (prohibiting public officials from demanding or accepting bribes to perform an unjust act); Article 387 (prohibiting public officials from soliciting improper gifts); Article 390 (prohibiting public officials from receiving improper gifts); Article 394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public officials from embezzling funds under his care); Article 400 (prohibiting

public officials from defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404 (prohibiting public officials from taking part in for-profit transactions within the limits of their jurisdiction); Article 493 (criminal threats); Article 496 (unlawful compulsion); Article 503 (forcibly requiring someone to sign, grant or quit claim a public instrument or document); Article 514 (theft); and Articles 528 and 533 (fraud). English translations of these provisions are set forth in Attachment C.

## V.

## FACTS

21. On information and belief, the United States alleges the following facts.

### A.   Relevant Names, Entities, and Terms

22. The following individuals, entities, and terms are relevant to this Complaint.

1. ***Teodoro Nguema Obiang Mangue ("Nguema")*** is the beneficial owner of the defendant assets, son of the President of E.G., and the Second Vice President of E.G. From 1998 to May 20, 2012, Nguema was E.G.'s (1) Minister of Forestry and Agriculture and (2) Minister of Forestry and Infrastructure. On May 21, 2012, Nguema was appointed by his father to be E.G.'s Second Vice President.

2. ***Teodoro Nguema Obiang Mbasogo*** is the President of E.G

3. ***Inner Circle***: A small number of individuals who hold critical positions of political and economic power in E.G.

4. ***Senate Permanent Subcommittee on Investigations Report ("PSI Report")***: Report issued in July 2004 by the United States Senate Permanent Subcommittee on Investigations ("PSI") on money laundering and foreign corruption, which focused in part on money brought to Riggs National Bank in the United States that was suspected of being proceeds of corruption in E.G.

5. *Riggs National Bank* was the financial institution in Washington, D.C., where the government of E.G. and members of the Inner Circle maintained depository accounts from 1995 to 2004. Riggs was convicted in 2004 of violations of 31 U.S.C. §§ 5322 and 5318(g) and agreed to pay a $16 million criminal fine and a $25 million civil penalty for failure to report suspicious transactions by high-risk customers, including the E.G. and other accounts.

6. *Somagui Forestal (Societe Madeira Guinea)* is a subsidiary of Grupo Sofona. Both entities are E.G. companies owned by Nguema through which Nguema has siphoned money from the E.G. government and received illegal payments and bribes. Nguema used accounts in various E.G. banks in the name of Somagui Forestal to purchase and maintain assets all over the world, including some of the defendant assets.

7. *Eloba Construccion* is an E.G. company owned by Nguema and Roberto Berardi, an Italian national. Nguema has used this company to misappropriate public funds and collect illegal payments and kickbacks. Nguema used accounts in E.G. banks in the name of Eloba Construccion to purchase and maintain assets all over the world, including the defendant assets.

## B.   Background

23. Equatorial Guinea is an oil-rich country in West Africa. The population in 2009 was approximately 680,000.

24. In 1979, the country's first president, Francisco Macías Nguema was overthrown in a coup d'état by his nephew, Brigadier General Teodoro Obiang Nguema Mbasogo. Thereafter, Teodoro Obiang became President of E.G. (hereinafter "President Obiang").

25. More than three decades after seizing control from his uncle, President Obiang is still in power.

26. President Obiang exercises plenary control over the E.G. government. Nearly all positions of political and economic power in E.G. are held by the Inner

1  Circle, many of whom are relatives of the President.

2      27.  One member of the Inner Circle is Nguema, President Obiang's eldest
3  son, who has been appointed by his father to various positions within the
4  government, including Second Vice President for National Defense and State
5  Security (May 21, 2012 to Present) and Minister of Forestry and Agriculture
6  (1998-2012) (at times, this position was titled Minister of Forestry and
7  Infrastructure).  Nguema is the beneficial owner of the defendant assets.

8      28.  Under E.G. law, the nation's mineral resources and hydrocarbons
9  belong to the public, not to individuals.  *See* Ley No 8/2006, de fecha 3 de
10 noviembre de Hidrocarburos de la Republica de Guinea Ecuatorial.  Similarly,
11 Equatoguinean law provides that the National Forestry Reserve is permanent,
12 inalienable, and part of the public domain, and that the National Forests are
13 reserved for exclusive economic extraction and development by the State.  *See*
14 Ley No 1/1997, Sobre El Uso Y Manejo De Los Bosques ("Forestry Law").

15     29.  Since the commencement of large-scale extraction of its oil reserves
16 beginning in the mid-1990s, E.G. has become a major oil and gas producer.  By
17 2004, it was the third-largest oil and gas producer in Sub-Saharan Africa.  Over
18 the last several years, oil and gas exports have resulted in billions of dollars in
19 annual revenue.

20     30.  Despite the extraordinary expansion in the E.G. economy and E.G.'s
21 laws regarding public ownership of the country's natural resources, living
22 standards of the general population remain at a subsistence level.  Meanwhile,
23 Nguema has used his position as a cabinet minister in his father's government to
24 extract enormous personal wealth from the people of E.G. and companies
25 operating in E.G. through extortion, bribery and the misappropriation, theft, and
26 embezzlement of public funds, all in violation of E.G. law.

27     31.  E.G. also derives income from natural resources other than oil and gas,
28 primarily timber, its second major export commodity.

32. As of 2006, the Equatoguinean economy had grown 20 times larger than it was in the mid-1990s, reflecting the massive revenues derived primarily from oil and gas production.

33. At the same time, over the last several years, Nguema and other members of the Inner Circle have gained enormous wealth through violations of E.G. law, including extortion, bribery and the misappropriation, theft, and embezzlement of public funds. Details concerning these illegal, corrupt acts are set forth below at paragraphs 46 through 122.

C.   **Riggs National Bank**

34. A significant portion of E.G.'s oil revenue was deposited into the U.S. financial system, including into accounts held at Washington, D.C.-based Riggs National Bank ("Riggs Bank"). By 2003, the E.G. portfolio had become the bank's largest single customer relationship, with balances and outstanding loans that together approached $700 million. The government of E.G., Nguema, Constancia Mangue (Nguema's mother), President Obiang, and other members of the Inner Circle maintained bank accounts at Riggs Bank.

35. Riggs Bank's involvement with E.G. led to an investigation conducted by the U.S. Senate's Permanent Subcommittee on Investigations ("PSI"). In 2004, the PSI Report concluded that Riggs Bank "turned a blind eye to evidence suggesting the bank was handling the proceeds of foreign corruption."

36. For example, as the 2004 PSI Report explained, one account, in the name of the Republic of Equatorial Guinea General Treasury, was known as the E.G. Oil Account because virtually all of the deposits were payments from foreign oil companies doing business in E.G. Riggs Bank records showed that President Obiang approved the wire transfer of nearly $35 million from the E.G. Oil Account to two companies, Apexside and Kalunga, which appeared to be connected to President Obiang, were unknown to the bank, and had accounts in jurisdictions with stringent bank secrecy laws. When Riggs Bank tried to obtain

information about the beneficial owners of these two companies from President Obiang at a meeting in Washington, D.C. on February 23, 2004, neither he nor another member of the Inner Circle would provide Riggs Bank with further information. That same day, Riggs Bank determined that the E.G. accounts should be closed.

37.     Riggs Bank's involvement with E.G.'s Inner Circle also resulted in the criminal prosecution of the bank. After closing the E.G. accounts, Riggs Bank pleaded guilty to failure to report suspicious monetary transactions by high-risk customers, in violation of 31 U.S.C. §§ 5322 and 5318(g). Riggs Bank agreed to pay a $16 million criminal fine and a $25 million civil penalty for its handling of the E.G. and other accounts.

D.     **Nguema's Acquisition of Political and Economic Power and Influence in E.G.**

38. In 1991, at the age of 23, Nguema came to the United States to study English as a Second Language at Pepperdine University in Malibu, California. He did not live on campus; instead, he shuttled between rooms at the Beverly Wilshire Hotel and a house he rented in Malibu. After five months, Nguema dropped out of the program. His tuition and living expenses (including his hotel bill and the rental of the house in Malibu) were paid by Walter Oil and Gas Corporation, an American oil company operating in E.G.

39. On January 8, 1993, less than two years after he left the Pepperdine program, and despite his youth and inexperience, Nguema was awarded a 20-year

concession[2] to harvest timber from 25,000 hectares (approximately 61,000 acres) of rainforest in E.G. by his father, President Obiang. Nguema was 24 years old.

40. As described below in additional detail in paragraphs 70-72, Nguema acquired a timber company in or around 1994 that had been operating in E.G. After liquidating all of the company's hard assets, Nguema re-named the company Grupo Sofona ("Sofona"). Two years later, in 1996, Nguema acquired another timber company in E.G. After selling all of that company's hard assets, Nguema re-named it Somagui. In 1998, Nguema informed Riggs Bank in Washington, D.C. that Somagui was a subsidiary of Sofona.

41. Nguema maintains personal bank accounts and accounts for his shell companies, Somagui and Sofona, at Société Générale De Banques En Guinee Equatoriale ("Société Générale") and Caisse Commune d'Epargne et d'Investissement ("CCEI Bank").

42. On or around May 5, 1994, Nguema's father granted Sofona a five-year concession to harvest timber from 11,000 hectares (approximately 27,000 acres).

43. In addition to granting his son the right to cut timber on 88,000 acres of national forest lands, President Obiang put Nguema in charge of regulating E.G.'s entire forestry industry. In approximately 1998, at the age of 30, Nguema was appointed by his father to the newly created position of "Minister of Forestry and Environment," later changed to "Minister of Forestry and Agriculture" (hereinafter "Minister of Forestry").

44. In the 2000s, the rapid growth of the oil and gas sector in E.G. led to a boom in construction and other infrastructure-related activities. In or around

---

[2]   A concession is the exclusive right to engage in logging in certain defined areas, for a certain period of time. Forestry concessions in E.G. are awarded by either the President or the Minister of Forestry without competitive bidding. Companies or individuals awarded a concession are permitted to harvest timber in the concession. They are obliged, however, to pay the E.G. government for any timber actually extracted from the concession.

2003, President Obiang added "infrastructure" to Nguema's cabinet portfolio, appointing Nguema to be E.G.'s first "Minister of Forests and Infrastructure."

45.  As an E.G. cabinet minister, Nguema's official salary was approximately $6,799 per month, or less than $100,000 per year, according to official E.G. sources.

### E.  Nguema's Utilization of Corrupt Schemes to Enrich Himself

46.  Nguema used his status as a cabinet minister and as President Obiang's son to enrich himself through the corrupt schemes described below.  As set forth herein, although these schemes are illegal under the laws of E.G., the applicable anti-corruption laws are not enforced against members of the Inner Circle, including Nguema.  Instead, members of the Inner Circle are allowed to keep funds obtained through corruption and to take the proceeds of their corruption abroad.

### a.  Extortion and Bribery Schemes

47.  Beginning in the 1990s, after he dropped out of Pepperdine and returned to E.G., Nguema began demanding that businesses in E.G. – especially those located in or around the City of Bata, the largest city and port in Rio Muni (E.G.'s mainland), where Nguema resided – pay him personal fees to be able to operate.  Nguema abused his authority and influence within the E.G. Government both as a member of the cabinet and President Obiang's eldest son to make these demands and to retaliate against those who refused to meet them.

### 1.  Nguema Required Timber Companies in E.G. to Pay Him a Personal Fee to Obtain Timber Export Licenses

48.  Timber was E.G.'s second largest export commodity.  The forestry sector was supervised and regulated by Nguema's Forestry Ministry.

49.  In order to export timber from E.G., companies were required to, among other things, apply for and obtain timber export licenses from a division of

the Forestry Ministry called the Office of Supervision, Information and Promotion of Forest Species ("OCIPEF").

50. At least as early as 1998, these licenses required Nguema's personal signature. Nguema required that timber companies, such as Tromad Forestal, an E.G. company, pay him personally in or around ten percent of the value of the wood harvested for export. Nguema refused to sign timber export licenses unless applicants first paid him these personal fees. The payments were demanded by Nguema or his associates even after all other formal taxes had been paid on the timber.

51. Between approximately 1998 and 2003, Germán Pedro Tomo, the owner of Tromad Forestal and an E.G. national, regularly paid personal fees to Nguema, either in suitcases of cash or with personal checks that Tomo deposited directly into a bank account in the name of Somagui at CCEI Bank. Tromad Forestal paid Nguema in or around the equivalent of $700,000 in CFA Francs ("CFAs") per year between 1998 and 2003 in order to export its products.

52. Nguema required other timber companies in E.G. to pay him or his shell company Somagui in or around 15,000 CFAs (approximately $30) per cubic meter for unprocessed wood and 13,000 CFAs (approximately $26) per cubic meter for processed wood that the company wished to export. These personal fees were calculated by technicians on the staff of Nguema's Forestry Ministry.

53. For instance, between 2000 and 2004, SITSA, an E.G. timber company owned by Gerard Decoup, a French national, and Angelo Cavozza, an Italian national, regularly paid personal fees to Nguema in order to obtain export licenses from the Forestry Ministry. SITSA paid Nguema either by depositing funds directly into Somagui's bank account at CCEI Bank or by providing money to an individual named Tess, an E.G. national who served as Nguema's personal secretary within the E.G. Forestry Ministry.

54. Between 2000 and 2003, Nguema demanded and collected from SITSA

10,000 CFAs (approximately $20) per cubic meter of timber that the company wished to export.  In or around 2003, Nguema increased that amount to 15,000 CFAs (approximately $30) per cubic meter.  Between 2000 and 2004, SITSA paid Nguema in or around the equivalent of $2.5 million dollars in corrupt personal payments in order to export its timber.

55.  Companies that refused to pay Nguema were prevented from exporting their timber from the Port of Bata, where nearly all of E.G.'s timber originated, and incurred additional operational expenses of up to $5,000 per day for delays leaving port.

**2.   Nguema Required Timber Companies in E.G. to Pay Him Personally to Gain Access to E.G.'s National Forests**

56.  Nguema also required timber companies to pay him a personal fee in order to gain access to E.G.'s forests.

57.  To harvest timber, companies were required to receive from Nguema's Forestry Ministry either a logging concession or a special permit.  To be granted such a permit or concession, Nguema demanded and collected personal fees from companies, such as Isoroy (a French company), ABM (a Spanish company), and Agroforestal (an Italian company).  All of these companies' E.G. operations were based in or around Bata.

58.  For example, in 1993, Nguema demanded that Isoroy pay him personally 15 million CFAs (approximately $21,000) to engage in logging in E.G.  Isoroy obtained a concession to harvest timber from 57,053 hectares of wilderness in E.G. on September 3, 1995.

59.  Similarly, between in or around 1998 and 2003, Shimmer International Guinea Equatorial Ltd. ("Shimmer"), the E.G. subsidiary of a Malaysian company, was permitted by Nguema to harvest timber anywhere it wished in E.G.'s mainland forests, including national forest reserves protected under E.G.'s Forestry Law from industrial logging.  Nguema demanded, and Shimmer's E.G.

general manager agreed, that in exchange for paying Nguema 30,000 CFAs (approximately $50) per cubic meter of timber harvested by Shimmer in E.G., Shimmer would be provided unfettered access to E.G.'s forests, including protected national forests, and would not be required to adhere to E.G.'s Forestry Law and its environmental and forest management regulations.

60. Other timber companies had comparable arrangements with Nguema and his Forestry Ministry. E.G.'s Forestry Law places strict controls on the manner in which timber is harvested. Among other things, E.G.'s laws regulate the quantity of timber that a company may extract from the forest; restricts timber companies from cutting down certain types of trees; and even requires loggers to replant areas that have been cut down. In exchange for paying personal fees to Nguema, companies like Shimmer were permitted to harvest timber from E.G.'s forests without complying with these or other forestry laws.

3.    **Nguema Required Companies in E.G. to Pay Him Personally on an On-Going Basis to Continue to Operate in E.G.**

61. Nguema further demanded that timber companies make regular payments to him personally while they maintained active operations in E.G. These companies included Isoroy, ABM, Agroforestal, and a company operated by Filipino nationals ("Company A").

62. For example, between 1993 and 1996, Isoroy paid Nguema in or around the equivalent of $104,000 every one or two months in order to be able to continue to operate in E.G. This fee was calculated based upon the weight of the timber harvested by Isoroy during that time period.

63. In or around May 1996, Nguema demanded that all foreign timber companies then-operating in E.G. pay him a retroactive fee that he called a "tax." This was an illegal tax that Nguema levied personally without authorization from

17

E.G.'s Parliament (*La Camara de Los Representantes*) or Inter-Ministerial Council (*el Consejo Interministerial*), as required under E.G. law. This new so-called "tax" required all foreign timber companies to pay Nguema personally a one-time retroactive fee of 6,400 CFAs (approximately $10) per cubic meter of timber that had ever been harvested by that entity in E.G.

64.  For instance, Nguema demanded that ABM, which began active logging operations in E.G. in the 1970s, pay him the equivalent of approximately $1,560,000 within four days of this new so-called "tax" being levied.

65.  Nguema required foreign timber companies who refused to pay these so-called "taxes," including Isoroy and ABM, to leave E.G.  Other timber companies, including Company A and a Moroccan firm, were permitted to continue to operate in E.G. after they paid Nguema his so-called retroactive "taxes."

66.  Nguema threatened and retaliated against timber companies, including Isoroy and ABM, who refused to submit to his demands for payment.  In or around May 1996, Isoroy refused to make any further payments to Nguema.  As a result, Nguema prevented Isoroy from harvesting further timber from E.G.'s forests and seized control of Isoroy's assets in E.G., including its heavy machinery, two Caterpillar D7G bulldozers, two Mercedes Benz 1622 construction trucks, a Mercedes Benz 1922/28 construction truck, a Mercedes Benz 1522 dump truck, three Toyota utility vehicles, two Mitsubishi L200 vans, a Suzuki vehicle, an Opel Corsa mini, and a Pajero vehicle.

67.  Only after Isoroy paid Nguema a monetary ransom did Nguema return this hardware to Isoroy's logistics personnel in Gabon.  Nguema charged Isoroy the equivalent of the value of the hard assets as a personal fee.

68.  During this same time period in 1996, Nguema personally threatened one senior Isoroy employee in Bata.  Nguema promised that he would make this Isoroy employee "suffer" because of the company's refusal to pay Nguema

1   money.  Soon thereafter, the employee was arrested and detained in jail.  After
2   being released, an E.G. national familiar with Nguema, advised the employee to
3   leave E.G. immediately if he did not want his children in Europe to become
4   orphans.

5          69.     In or about 1994, Nguema took over the Italian company, Siem
6   S.P.A.  Siem S.P.A. had worked in the E.G. timber industry for seven years
7   harvesting timber and training E.G. nationals how to do the same.  After
8   expropriating for his own use the company's assets and then liquidating them,
9   Nguema changed its name to Sofona.  Thereafter, Nguema used Sofona as a shell
10  company to receive the proceeds of his corrupt acts.

11         70.     Nguema acquired another of his shell companies in a similar manner.
12  In or around May 1996, when ABM refused to pay Nguema his so-called
13  retroactive "tax," E.G. authorities entered ABM's offices near Bata, forcibly
14  removed ABM personnel from the premises, and expelled them from E.G.
15  Nguema then required ABM's owner, a Spanish national, to transfer ownership of
16  ABM to Nguema for in or around one-third of its actual fair market value in a
17  transaction that Nguema called a "sale."

18         71.     After acquiring ABM, Nguema had the company's former owner
19  arrested in Bata and accused of fraud for charging Nguema an inflated price for
20  the company.  ABM's former owner was convicted and released only after paying
21  Nguema the equivalent of $3 million in so-called civil penalties.  ABM's assets,
22  including its heavy machinery and timber logging equipment, were also
23  expropriated by Nguema without further compensation.  Nguema required that
24  Shimmer purchase ABM's logging equipment from him at significantly inflated
25  prices.

26

27

28

72.   Nguema then changed ABM's name to Somagui.  Somagui did not engage in any actual business activity; rather, it served as a receptacle for the proceeds of Nguema's corrupt acts.

73.   Even outside of the forestry sector, Nguema used his position as a government official in his father's cabinet to demand that companies operating in E.G. pay him money and provide him with gifts of cash and other luxury products. For instance, after 2003 when "infrastructure" was first added to Nguema's cabinet portfolio, General Work, S.A., a major E.G. government infrastructure contractor, purchased and gave Nguema a $100,000 Italian luxury automobile – a Ferrari that Nguema demanded General Work acquire for him.  The funds were provided by General Work to a car dealership located in Treviso, Italy.  General Work executives believed that their company would be expelled from E.G. and precluded from operating in that country if they did not accede to Nguema's demands.

74.   Similarly, in or around 2003, Nguema demanded that Tromad SA Constructions Y Obras ("Tromad"), an E.G. company retained by the E.G. government to build roads, pay him personally 15 percent of the value of its government contract to build a highway.  When Tromad refused to pay Nguema, the E.G. government stopped making payments to the company and its contract with the E.G. government was terminated.

75.   Between 2004 and 2007, Nguema's Forestry Ministry demanded that Global Santa Fe Corp. ("GSF"), a U.S.-based oil and gas services company, provide Nguema with gifts and money.  Nguema's ministry staff made these types of requests of GSF personnel one or two times per year.  When a manager at GSF's Malabo office refused to make payments, he was threatened by Nguema's staff and shown a document detailing numerous gifts and payments other foreign companies had made to Nguema.

///

### 4.   Nguema Required Companies in E.G. to Pay Him Personal Fees to Import Goods and Equipment

76.  In addition to demanding and collecting personal fees on exports, Nguema levied a personal fee on imports arriving through the Port of Bata.

77.   Companies seeking to bring goods and equipment into E.G. through the Port of Bata were charged an official import tax by the general revenue service of the Equatoguinean government.  Between at least 2003 and 2007, certain companies were also required to pay a second, personal fee to Nguema through his agents.

78.   In at least one case, General Work, which imported the vast majority of the materials it used in its operations, was forced by Nguema to pay monthly wages of $3000 to the very agents Nguema had charged with collecting his illegal import fees in Bata

79.   The above-described corrupt schemes, as described in paragraphs 47 through 78, violate the following provisions of E.G. law, which are adopted from the 1968 Criminal Code of Spain:  Article 131 (abuse of public office);  Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession or involve oneself in a business directly related to scope of official duties); Articles 200 and 202 (collection of illegal taxes); Article 385 (prohibiting public officials from demanding or accepting bribes to perform a crime); Article 386 (prohibiting public officials from demanding or accepting bribes to perform an unjust act); Article 387 (prohibiting public officials from soliciting improper gifts); Article 390 (prohibiting public officials from receiving improper gifts); Article 394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public officials from embezzling funds under his care); Article 400 (prohibiting public officials from defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404 (prohibiting public officials from taking part in for-profit

transactions within the limits of their jurisdiction); Article 493 (criminal threats); Article 496 (unlawful compulsion); Article 503 (forcibly requiring someone to sign, grant or quit claim a public instrument or document); Article 514 (theft); and Articles 528 and 533 (fraud).  *See* Attachment C.

### b. Schemes to Obtain Government Infrastructure Funds Through Extortion, Bribery, Fraud and Misappropriation

80.  Nguema obtained extortion payments and misappropriated, embezzled and stole public funds and resources in violation of E.G. law.  He did so by: (i) using E.G. companies to submit fraudulently inflated "bids" and invoices for government contracts in which corruption payments to his shell companies were built in as payments to subcontractors; (ii) using his shell companies to receive and retain hundreds of millions of dollars in payments from the E.G. government in connection with infrastructure contracts that those shell companies either never performed or performed incompletely; and (iii) directly diverting public funds from the E.G. government.

### 1. Nguema Misappropriated E.G. Public Funds By Receiving Payment for Fraudulently Inflated Public Construction Contracts

81.  Nguema has misappropriated public funds from the E.G. Government by receiving tens of millions of dollars in payments from fraudulently inflated construction contracts in E.G.

82.  The process of awarding government contracts in E.G. is sensitive, secretive, and controlled by Nguema and his family, including his father, President Obiang.  Government contracts are often awarded to companies owned by or associated with members of the Inner Circle without true competition.  One result is that those companies are able to charge the E.G. government fees that bear little, if any, rational relationship to the actual economic value of the services

or products tendered to the E.G. government.  The bids from such companies include built-in mark-ups of 50 to 1000 percent or more, so that members of the Inner Circle can obtain the difference.  These fraudulently inflated contracts are another means by which Nguema, and other members of the Inner Circle, have misappropriated funds from the public treasury for their own enrichment.

83.   Nguema has admitted that, as a cabinet minister, he takes for himself a "sizeable part" of government contracts.  In 2004, for instance, Nguema claimed that he purchased real estate in Cape Town, South Africa, worth approximately $8 million with money obtained through government construction contracts awarded to Socage, a company he owns in E.G.  Specifically, in a sworn affidavit filed by Nguema with a court in South Africa, Nguema explained:

> Cabinet Ministers and public servants in Equatorial Guinea are by law allowed to owe [sic] companies that, in consortium with a foreign company, can bid for government contracts and should the company be successful, then what percentage of the total cost of the contract the company gets, will depend on the terms negotiated between the parties.  But, in any event, it means that a cabinet minister ends up with a sizeable part of the contract price in his bank account.

This is how, according to Nguema, he acquired in or around $8 million to purchase his properties in South Africa.  Contrary to Nguema's recitation of the law, such self-dealing by a public official is illegal in E.G.  *See* Attachment C, E.G. Penal Code Articles 103 (abuse of public office); 198 (expropriation of assets by a public official); 401 (criminal conflict of interest by a public official); 404 (prohibiting public officials from taking part in for-profit transactions within the limits of their jurisdiction).

84.  Between 2003 and 2007, for instance, Nguema demanded that executives at General Work submit fraudulently inflated construction bids and

contracts to G.E. Proyectos, an agency of the E.G. government in charge of awarding public construction contracts. Nguema would direct General Work executives to inflate contract bids by as much as 500 percent. A portion of the money paid by the government of E.G. to General Work would be transferred to Nguema and/or one of his shell companies. Executives at General Work believed that if they had not acquiesced to Nguema's demands, their company would have been expelled from E.G.

85. Specifically, General Work fraudulently inflated certain line items in several different construction bids tendered by the company to G.E. Proyectos. After G.E. Proyectos awarded the contract to General Work, the Banque des Etats de l'Afrique Centrale ("E.G.'s central bank"), wired a portion of the inflated contract amount to General Work's account at CCEI Bank. General Work would then provide kickbacks to Nguema or one of his associates in the form of a bearer check or a check with the payee line left blank. These checks were deposited into CCEI accounts held in the name of Somagui or Socage. Hundreds of these payments were made by General Work to Nguema or for his direct benefit in or around the time period that Nguema acquired the defendant real property.

86. For instance, as set forth below, according to information, including banking records provided by a paid government informant, General Work issued at least $17,424,291.46 in corrupt payments for Nguema's benefit from its commercial checking account at CCEI Bank between March 9, 2004, and January 11, 2007:

| Date of Check | Amount |
|---|---|
| March 9, 2004 | 178,000,000 CFAs (approximately $356,000) |
| June 16, 2004 | 100,000,000 CFAs (approximately $200,000) |
| September 8, 2004 | 3,000,000,000 CFAs (approximately $6 million) |

| | |
|---|---|
| September 22, 2004 | 4,200,000 CFAs (approximately $8,400) |
| December 10, 2004 | 1,517,000,000 CFAs (approximately $3,034,000) |
| December 18, 2004 | 5,000,000 CFAs (approximately $10,000) |
| February 5, 2005 | 4,000,000 CFAs (approximately $8,000) |
| March 16, 2005 | 5,490,000 CFAs (approximately $10,980) |
| May 24, 2005 | 1,058,416,820 CFAs (approximately $2,116,833.64) |
| June 27, 2005 | 10,000,000 CFAs (approximately $20,000) |
| June 29, 2005 | 6,800,000 CFAs (approximately $13,600) |
| July 18, 2005 | 5,000,000 CFAs (approximately $10,000) |
| July 23, 2005 | 7,000,000 CFAs (approximately $14,000) |
| October 7, 2005 | 2,600,000 CFAs (approximately $5,200) |
| November 9, 2005 | 30,000,000 CFAs (approximately $60,000) |
| November 13, 2005 | 827,427,926 CFAs (approximately $1,654,855.91) |
| November 14, 2005 | 827,427,926 CFAs (approximately $1,654,855.91) |
| November 15, 2005 | 6,000,000 CFAs (approximately $2,000) |
| November 24, 2005 | 2,500,000 CFAs (approximately $5,000) |
| April 5, 2006 | 1,000,000 CFAs (approximately $2,000) |
| April 12, 2006 | 30,000,000 CFAs (approximately $60,000) |
| April 12, 2006 | 100,333,000 CFAs (approximately $200,666) |

| April 22, 2006 | 22,000,000 CFAs (approximately $44,000) |
| June 17, 2006 | 6,200,000 CFAs (approximately $2,400) |
| June 27, 2006 | 8,000,000 CFAs (approximately $16,000) |
| July 6, 2006 | 5,000,000 CFAs (approximately $10,000) |
| July 8, 2006 | 1,600,000 CFAs (approximately $3,200) |
| July 12, 2006 | 4,650,000 CFAs (approximately $9,300) |
| July 27, 2006 | 26,500,000 CFAs (approximately $53,000) |
| August 16, 2006 | 6,000,000 CFAs (approximately $12,000) |
| August 21, 2006 | 12,000,000 CFAs (approximately $24,000) |
| September 5, 2006 | 5,000,000 CFAs (approximately $10,000) |
| September 12, 2006 | 30,000,000 CFAs (approximately $60,000) |
| September 21, 2006 | 15,000,000 CFAs (approximately $30,000) |
| October 17, 2006 | 750,000,000 CFAs (approximately $1,500,000) |
| December 11, 2006 | 20,000,000 CFAs (approximately $40,000) |
| December 20, 2006 | 32,000,000 CFAs (approximately $64,000) |
| December 22, 2006 | 20,000,000 CFAs (approximately $40,000) |
| January 11, 2007 | 30,000,000 CFAs (approximately $60,000) |

87.     Nguema also required that his companies, Somagui and Socage, either (i) be listed as a subcontractor on certain of General Work's bids, so that

26

G.E. Proyectos would know that Nguema was associated with the bid, or (ii) sign a subcontract with General Work. These subcontracts were created solely to justify the issuance of illicit payments from General Work to Nguema and/or his shell companies. The work and services described in these subcontracts were performed and paid for by General Work, and not Somagui, Sofona, or Socage, as set forth below at paragraphs 88 through 96. Nguema's companies, which existed only on paper, had no significant commercial operations and were merely vehicles through which Nguema could receive payments from companies such as General Work.

2. **Nguema Diverted E.G. Public Funds By Receiving Payment for Public Construction Contracts that His Companies Never Performed and Extorting Businesses in E.G.**

88. Nguema obtained extortion payments and misappropriated funds from the E.G. government by receiving and retaining hundreds of millions of dollars in payments for infrastructure contracts that his companies never performed or completed.

(i) **Nguema's Use of Somagui to Misappropriate Public Funds**

89. While Nguema was serving as E.G.'s Minister of Infrastructure, his company, Somagui, was given a highway-construction contract by the E.G. government on or about November 13, 2004. Under that contract, Somagui was tasked with building a 45-mile highway connecting the Equatoguinean border towns of Mongomo and Ebebiyin (the "Ebebiyin-Mongomo Highway"). The contract had a three-year term and the work was to be completed in or about November 2007.

90. Initially valued at $137 million, the E.G. government later raised the value of the contract to $200 million and then made initial payment(s) to Somagui

1   in the amount of $182 million.  At the time, this was the largest government

2   contract ever given to Somagui.

3          91.  Because Somagui existed only on paper and performed no commercial

4   functions, Nguema subcontracted the work to General Work.  Although the

5   government of E.G. had paid Somagui $182 million of the total $200 million

6   value of the contract, General Work agreed to build the highway for $44 million;

7   $156 million less than the value of the contract and $138 million less than

8   Somagui had already been paid by the E.G. government.  Nevertheless, Somagui

9   only paid General Work $15 million toward the completion of the highway-

10  construction project and the company was forced to stop work for lack of funds.

11         92.  Thereafter, the government of E.G. cancelled the contract with

12  Somagui for failing to complete the project.  The E.G. government did not recoup

13  the $182 million that it had already paid to Nguema through his shell company

14  Somagui.

15         93.  The government of E.G. then re-awarded the Ebebiyin-Mongomo

16  Highway contract to the China Road and Bridge Corporation ("China Road and

17  Bridge"), a civil engineering company based in Beijing, China.  That contract was

18  valued at $96 million.  In order to assume the contract, however, China Road and

19  Bridge, entered into a separate contract with Somagui.  Under that contract, which

20  was signed by Nguema on behalf of Somagui, China Road and Bridge agreed to

21  pay a fee to Somagui of 20 percent (approximately $19 million) of the total

22  contract award.

23         94.  Beginning in or around January 2009, China Road and Bridge paid the

24  $19 million fee in installments to Somagui's bank account at Société Générale of

25  E.G. – the same E.G. bank where Nguema maintained the accounts that he used to

26  purchase the defendant real property.

27         95.  By the time China Road and Bridge began work on the Ebebiyin-

28  Mongomo Highway, Nguema, through his shell company Somagui, had reaped a

personal profit of $186 million dollars despite his company's failure to perform under the contract.

96. Somagui had been given a similar contract on or about November 18, 2003, valued at approximately $23.4 million. The project was to be completed in 16 months and involved resurfacing two stretches of highway in E.G. As of September 2010, the project had not been completed and another construction company had taken over some or all of the contract.

### (ii)   Nguema's Misappropriation and Theft of Funds Through Eloba

97. In or around 2008, Roberto Berardi, an Italian national, formed Eloba Construccion ("Eloba"), an E.G. construction company based in the port city of Bata. Berardi, who served as Eloba's managing director between 2008 and January 2013, used his personal funds and capital, including nearly €2 million (approximately $2.3 million) worth of construction equipment imported from Cameroon, to form Eloba. While maintaining a forty percent minority stake in the company, Berardi granted a 60 percent majority ownership stake in Eloba to Nguema for no consideration. Eloba executives believed that providing Nguema with a free ownership stake in the company was necessary for the company to be able to operate in and obtain public contracts in E.G.

98. Between 2008 and January 2013, Eloba operated as a government contractor based in Bata, E.G., with in or around seven professional employees and in or around 40 unskilled workers retained on a short-term basis. However, as described below, between 2008, when Eloba was first formed, and January 2013, Eloba has operated at a loss and has never generated any profit. Indeed, between 2008 and January 2013, Eloba received less than 3.1 billion CFAs (approximately $6.2 million) in total gross revenue during this period, almost all of which was used to pay for Eloba's capital overhead and operational expenses.

### (iii)   Nguema Misappropriated State Funds Allocated by the E.G. Government to Construct Public Markets in Ikunde and Bikuy.

99.  According to Eloba Witness A, Eloba Witness B, Eloba Witness C, and Eloba Witness D, all of whom were construction company employees who worked with Eloba personnel in E.G., and who communicated with a senior Eloba manager with direct knowledge of the relevant facts described in paragraphs 99 through 113, Nguema used Eloba as a vehicle to steal public funds.

100.  In or around 2008, Eloba was retained by ABC Corp. ("ABC"), an E.G. government contractor, to build two public markets in Ikunde and Bikuy ("Ikunde-Bikuy Project") for the E.G. Government.  This was the first contract ever obtained by Eloba since its formation in 2008.

101.  The E.G. government originally awarded the Ikunde-Bikuy Project, worth 8.8 billion CFAs (approximately $17.6 million), to ABC.  ABC then retained Eloba as a sub-contractor to build these two public markets on its behalf. ABC is owned by Constancia Obiang, Nguema's mother.

102.  In or around December 2010, ABC paid Eloba an advance payment of in or around 1.3 billion CFAs (approximately $2.6 million) for the Ikunde-Bikuy Project.  This payment was the first time Eloba generated business income of any kind since its formation in 2008.

103.  According to Eloba Witness C, Nguema demanded and obtained from Eloba in or around 300 million CFAs (approximately $600,000) soon after Eloba received the advance payment from ABC.  Despite the fact that the E.G. government allocated these funds for an express public purpose — namely, the construction of public markets in Ikunde and Bikuy — Nguema demanded and caused these public funds to be diverted to him personally.  None of these public funds taken by Nguema were used in connection with the Ikunde-Bikuy Project or to pay for Eloba's business expenses.

104. Eloba had to obtain a line of credit from the Banque Gabonaise et Francaise Internationale ("BGFI Bank"), the E.G. subsidiary of a Gabon-based financial institution, to finance its continued construction of the Ikunde-Bikuy Project. This was because Eloba generated no other business income during this time period.

105. In or around 2011, after Eloba had erected the foundation pillars for the Ikunde-Bikuy Project and had completed the construction of nearly 6,500 square meters of foundation for the two public markets, Eloba submitted certified invoices to ABC for payment of approximately 702 million CFAs (approximately $1.4 million) in connection with its work on the Ikunde-Bikuy Project. However, according to Eloba Witness A and Eloba Witness B, two Eloba Witnesses with direct knowledge of Eloba's operations and business practices, ABC refused to pay Eloba.

106. Between 2011 and 2012, Eloba tendered additional certified invoices to ABC requesting payment of nearly an additional 800 million CFAs (approximately $1.6 million) as compensation for services provided to ABC, including construction of the Ikunde-Bikuy Project. Instead of paying in full, ABC in or around 2012 provided only a partial payment to Eloba for 500 million CFAs (approximately $1 million). This payment was the second time Eloba ever generated business income of any kind since its formation in 2008.

107. But, soon after Eloba received these funds, Nguema, according to Eloba Witness A, again demanded and collected from Eloba approximately 166 million CFAs (approximately $332,000). Although these funds were allocated by the E.G. government for an express public purpose — namely, to build the Ikunde-Bikuy Project — Nguema caused these public funds to be diverted to him personally. According to Eloba Witness A, Eloba Witness B, and Eloba Witness C, all of whom were familiar with Eloba's books and records, as well as the company's business operations, Nguema did not use the public funds he diverted

from Eloba in connection with the Ikunde-Bikuy Project or to pay for Eloba's business expenses.

108.  Although the E.G. government provided public funds to both ABC and Eloba to complete the Ikunde-Bikuy Project, the Ikunde-Bikuy Project remains unfinished at least in part because Nguema diverted approximately 466 million CFAs (approximately $932,000) of these funds from Eloba for his personal use.

**(iv)  Nguema Sought to Misappropriate State Funds Allocated to Eloba by the E.G. Government to Construct Army Barracks in Mongomo.**

109.  In or around September 2012, after Nguema was appointed E.G.'s Second Vice President for National Defense and State Security, G.E. Proyectos awarded Eloba a contract to build a military barracks facility for the E.G. Army in La Plaza de los Presidentes in Mongomo, E.G. ("Mongomo Project").  This contract was valued at 13,245,708,615 billion CFAs (approximately $26,491,417 million).

110.  On or around September 21, 2012, the E.G. government's Public Treasury wired 1,258,342,319 CFAs (approximately $2.5 million) as an initial advance payment for the Mongomo Project to Eloba's account at BGFI Bank. This payment was the third time Eloba generated business income since its formation in 2008.

111.  However, according to Eloba Witness A, Eloba Witness B, and Eloba Witness C, BGFI garnished the entire advance payment because Eloba had an outstanding balance on its BGFI line of credit as a result of Nguema misappropriating the business' funds, as described above at paragraph 107.  For this reason, Eloba had to apply for and obtain a further line of credit from banks in E.G. to commence operations on the Mongomo Project.

112.  In or around December 2012, according to Eloba Witness C, Nguema demanded that Eloba pay him in or around 415 million CFAs (approximately $830,000), the equivalent of one-third of the advance payment tendered to Eloba by the E.G. government for the Mongomo Project.  After Berardi explained to Nguema that BGFI had garnished these funds, Berardi was arrested by police officers in Bata and incarcerated in the Bata Central Prison beginning in or around January 2013.

3.    **Nguema Directly Diverted Public Funds to Bank Accounts Under His Direct Control**

113.  Nguema diverted E.G. public resources and monies for his personal use, including the purchase of the defendant real property.  Prior to April 2006, the equivalent of tens of millions of dollars in CFAs were transferred from the E.G. public treasury to Nguema's personal account at Société Générale.  Nguema then caused $29,542,000 in his personal Société Générale  account to be funneled to an escrow account at First American Trust in the United States.  The funds were then used to purchase the defendant real property.

114.  Similarly, since at least as early as 2005, Nguema has maintained public funds and revenue collected by his Forestry Ministry in a separate account (the "Forestry Account") at a private commercial bank in E.G.  This is in contrast with the management of other E.G. Government funds, which are maintained by E.G.'s Treasurer at BEAC.  No E.G. public official or agency, including E.G.'s Parliament, its Ministry of Finance, and its Treasury, possesses the authority or ability to supervise, regulate or inspect how the funds in the Forestry Account are used.

115.  Other than Nguema's Forestry Ministry, no other E.G. state agency or institution maintains an account like this one.

33

116.  This Forestry Account is used by Nguema to maintain millions of dollars worth of CFAs collected as state revenue by E.G.'s Forestry Ministry from timber companies operating in E.G.  The funds in this account include surface taxes paid by all persons who hold forestry concessions in E.G., fees charged to timber companies who harvested logs from such concessions, and official timber export duties collected by the Forestry Ministry.  Instead of depositing this revenue into BEAC like other public agencies, Nguema diverted and maintained these public funds in his Forestry Account.

117.  At the time that Nguema acquired the Defendant Assets, he was the sole signatory on this Forestry Account, possessing exclusive authority and control over how the funds in the Forestry Account are used and disbursed.

118.  In 2006, economists and auditors from the International Monetary Fund ("IMF"), a United Nations financial agency, were permitted to access and review E.G.'s economic policies and data, including information and records relating to the E.G. Government's financial and fiscal management policies.  When U.N. personnel requested that they be permitted to also review and access data and records relating to the Forestry Account, their requests were denied.

   4.   **Nguema Stated Publicly to Third Parties That He Intended to Misappropriate Hundreds of Millions of Dollars in State Funds**

119.  Nguema has represented to U.S.-based companies that he possessed both the ability and the intent to divert millions of dollars in E.G. public funds to acquire and pay for personal assets.

120.  In or around February 2004, Nguema contacted an executive at Ocean Energy, a U.S.-based energy company, and requested that Ocean Energy purchase a C-130 Hercules military transport aircraft from Lockheed Martin, a U.S. defense contractor, for his personal use.  A C-130 Hercules transport can cost up to $65

million.  Nguema proposed that Ocean Energy purchase the aircraft on his behalf, and that Ocean Energy, in turn, would be paid by the E.G. government. Specifically, Nguema advised Ocean Energy that GE Petrol, E.G.'s state-owned oil company, would compensate Ocean Energy for this transaction.  Ocean Energy refused to go along with Nguema's scheme.

121.  That same year, Nguema advised an executive at Gulfstream Aerospace Corporation, a U.S.-based aircraft manufacturer, that he could and would have Ocean Energy assume responsibility for making the payments on a $40 million personal jet aircraft that Ocean Energy would acquire on his behalf. These funds would then be credited against balances owed by Ocean Energy to the government of E.G.  In this roundabout manner, Nguema again represented that he intended to misappropriate E.G. government funds to acquire a $40 million personal asset.  Gulfstream refused to go along with Nguema's scheme to use state resources to acquire personal assets.

122.  The above-described corrupt schemes, as described in paragraphs 80 through 121, violate the following provisions of E.G. law, which are adopted from the 1968 Criminal Code of Spain:  Article 131 (abuse of public office);  Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession directly related to scope of official duties); Article 385 (prohibiting public officials from demanding or accepting bribes to perform a crime); Article 386 (prohibiting public officials from demanding or accepting bribes to perform an unjust act); Article 387 (prohibiting public officials from soliciting improper gifts); Article 390 (prohibiting public officials from receiving improper gifts); Article 394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public officials from embezzling funds under his care); Article 400 (prohibiting public officials from defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404 (prohibiting public officials from taking part in for-profit

transactions within the limits of their jurisdiction); Article 493 (criminal threats); Article 496 (unlawful compulsion); Article 514 (theft); and Articles 528 and 533 (fraud). *See* Attachment C.

       c.    **Nguema Uses Shell Companies in E.G. to Conceal His Criminal Conduct and to Mask the True Source of His Illicitly Acquired Wealth**

    123.  While acquiring millions of dollars in criminal proceeds from the corrupt schemes described above, Nguema used shell companies in E.G., including Somagui, Sofona and Eloba, to disguise his criminal conduct, conceal the source of his income, and to claim falsely to financial institutions and foreign governments that his income was derived from legitimate commercial activity in E.G.

       1.    **Nguema used Somagui and Sofona to Conceal and Obscure His Criminal Conduct and the Source of His Wealth**

    124. Beginning in the 1990s, Nguema claimed falsely to numerous American and European financial institutions (at which he opened bank accounts to funnel and shelter his criminal proceeds) that his companies Sofona and Somagui generated hundreds of millions of dollars in commercial profits. These companies, according to Nguema, exported and marketed hundreds of thousands of cubic meters of timber every year on international markets; were singlehandedly responsible for 69 percent of E.G.'s gross domestic timber production in 2001; and were singlehandedly responsible for 73 percent of E.G.'s construction-related gross domestic product in 2004, building and paving more than 200 kilometers of highway in E.G. In fact, as discussed below, these representations are false, and Sofona and Somagui exist only on paper.

    125.  Neither Sofona nor Somagui engaged in any significant business operations in E.G. They had few, if any, employees and earned no legitimate

revenue, let alone on the exceptional scale Nguema has claimed.  These companies served solely as receptacles for Nguema's ill-gotten gains.

126.  Despite efforts to verify the existence of Sofona and Somagui, financial institutions in multiple jurisdictions could not confirm Nguema's claims that his companies performed actual operations and had legitimate sources of revenue:

(i)     In 2002, J.P. Morgan, where Nguema maintained a bank account, sought to obtain more information about Sofona and Somagui.  Despite researching local trade directories and reference books, and making numerous inquiries about both companies in E.G., including with the local chamber of commerce, businesses, banks, and authorities, J.P. Morgan personnel in both the United States and the United Kingdom could not confirm that Sofona or Somagui existed, let alone engaged in commercial operations of any kind.  Although J.P. Morgan identified a phone number in E.G. associated with Sofona, J.P. Morgan reported that its calls were never answered.  In contrast with Nguema's contention that by 2001 these companies singlehandedly controlled nearly 70 percent of E.G.'s timber industry, E.G.'s second-highest revenue generating export, J. P. Morgan personnel concluded that both Sofona and Somagui were "unknown in the local market."

(ii)    Likewise, in 2004, at a time in which Nguema claimed that Sofona and Somagui were even larger and more dominant in the E.G. economy, Riggs Bank, where Nguema, his parents, and other Inner Circle members opened several bank accounts, sought to investigate and confirm Nguema's representations about his companies.  Relying on various bank resources and almost two dozen electronic databases and search engines, a fraud investigator with Riggs Bank in Washington,

D.C. concluded that no evidence of Sofona's or Somagui's existence in E.G. could be ascertained.

127. Similarly, individuals who lived or worked in E.G. between 2000 and 2007 who were knowledgeable about the forestry and/or infrastructure industries in E.G. reported that neither Sofona nor Somagui were known in E.G. as commercial businesses with actual legitimate operations. These individuals include international development workers in E.G., commercial business persons, E.G. nationals and residents, and employees of non-governmental organizations ("NGOs"), including a major U.S.-based environmental NGO active in E.G.'s forestry sector. For instance:

(i)     An American forestry expert employed by an NGO in Bata from 2005 to 2009 worked closely with Nguema's Forestry Ministry on conservation and forest-management issues. Yet, he could not confirm that either Sofona or Somagui existed, nor could he say whether either was active in E.G.'s timber or construction industries.

(ii)    Germán Pedro Tomo is an E.G. national who served as a member of E.G.'s Parliament and owned the E.G. timber company Tromad Forestal until 2003. He explained that Somagui had no more than one or two employees; had an office in Bata that was rarely open; and had no function other than to open bank accounts and receive illegal payments during the time period Tomo operated his timber company in E.G. (1998-2003).

(iii)   A timber company executive who worked with SITSA between 2000 and 2004, and was familiar with E.G.'s timber sector, also confirmed that Somagui had no actual employees and was operated as a corporate vehicle to open and maintain bank

accounts that timber companies used to deposit corrupt payments for Nguema's benefit;

(iv)   An E.G. lawyer and former civil servant who worked on the staff of a former E.G. cabinet member states that Somagui and Sofona are merely shell companies with "no real business." The lawyer did not know of any companies or businesses owned by Nguema that engage in genuine commercial or business operations.

(v)   An individual who served as a senior financial advisor to the E.G. Finance Minister in or around the same time that Nguema purchased the defendant real property and who had access to the E.G. government's infrastructure expenditures and revenue had never heard of Sofona and could provide no specific information about Somagui.

(vi)   A U.S. Department of Agriculture forestry expert, who visited Bata and various E.G. forests in 2004 to consult on technical assistance matters and survey forest management issues in E.G., also never heard of Sofona or Somagui.

(vii)   An American who worked for Afriam, a company that obtained a 25,000 hectare forestry concession in E.G. in 1994 and operated in or around Bata during the 1990s, also reported that he never heard of Sofona or Somagui.

(viii)   A senior accountant and lawyer who worked in a Big Four accounting firm's E.G. office between 2004 and 2007, the same time period in which Nguema acquired the defendant real property, recalled that although s/he observed a significant amount of infrastructure-related construction in E.G., most of that work was performed by Chinese and Middle Eastern construction

companies.  This individual had never heard of Somagui or Sofona.

(ix)     Several contractors employed by U.S. AID, an agency of the United States Government, who resided in E.G. between 2005 and 2009, were focused specifically on issues of economic and social development in E.G., and worked closely with the staff of E.G.'s Ministry of Planning, Economic Development and Public Investment, its Ministry of Finance, and its Ministry of Fishing and the Environment.  These individuals reported that they had never heard of Sofona or Somagui.

(x)      A finance manager who worked for a major oil and gas services logistics company in Bata, E.G., also had never heard of Somagui despite being in business in E.G. in or around the same time period that Nguema purchased the defendant real property and being a close neighbor of Nguema.

(xi)     The Chinese civil engineering company, China Road and Bridge Corporation claims that it, not Somagui, built the Ebebiyin-Mongomo Highway in E.G.

F.     **Nguema Does Not Have Legitimate Income Sufficient to Account for His Hundreds of Millions of Dollars in Personal Purchases and Expenditures**

128.  From 2000 to 2011, Nguema spent more than $300 million acquiring assets and property on four continents – North America, South America, Europe and Africa.  In the United States alone, Nguema spent $68 million during a period of less than three months in 2006 on two assets:  the Sweetwater property, for which the purchase price was $30 million, and a Gulfstream G-V jet aircraft, which cost over $38 million.

40

129.  For every year between 2000 and 2011, Nguema's enormous personal expenditures vastly outpaced and were inconsistent with **both** (i) his public official salary of less than $100,000 per year, and (ii) the fraudulent income he purportedly generated from his companies Sofona and Somagui, a subsidiary of Sofona.

A.   In **1999**, Sofona's financial statements reported that the company incurred losses of 828,238,750 CFAs (approximately $1,129,930) and that the shareholders, managers and directors of the company received no compensation from the company.

B.   In **2000**, Sofona's financial statements reported that the company incurred 236,005,058 CFAs (approximately $321,971) in losses. Like the prior year, these statements again indicate that the company provided no compensation or income to its shareholders, directors and managers.  Yet Nguema spent and/or wired in or around approximately **$13,451,964** into the United States and throughout the world.  For instance, Nguema spent approximately $857,000 acquiring luxury automobiles in France, including an Aston Martin, a Ferrari and a Peugeot, with no financing or use of borrowed funds. In the United States, Nguema's account at Riggs Bank received two wires from Somagui's account at CCEI Bank in E.G. for (i) $1,099,980 on March 13, 2000; and (ii) $999,980 on April 11, 2000, even though the company's financial statements that year reported that Somagui had losses of almost six-times that amount.  Nguema's Riggs Bank account also received additional wires from accounts in his own name at (i) Citibank for $5 million on February 22, 2000, and (ii) CCF Banque Privee Internationale, a French bank, for $5.495 million on March 3, 2000.

C.   In **2001**, Nguema reported in Sofona's financial statements that the company generated 2,245,980,864 CFAs ($3,064,093) in net income. Yet, that year Nguema spent and wired into the United States in or around **$11,109,082**. Nguema spent $8,009,210 in California alone, including purchasing a $6,500,000 property on Antelo Road in Bel Air, California and a Bentley vehicle for $651,500.  In addition, Nguema's Riggs Bank account received three wires from Somagui's

41

account at CCEI Bank in E.G. for (i) $999,932 on March 26, 2001; (ii) $999,980 on May 1, 2001; and (iii) $999,980 on August 16, 2001. Nguema's account at Chase Manhattan received an additional wire from Somagui's CCEI account in E.G. for $99,980 on November 7, 2001. These expenses amounted to more than 250 percent of Sofona's purported total net income.

D.   In **2002**, Nguema received in or around **$3,326,650** in wires from E.G. Specifically, Nguema's Riggs Bank account received two wires from Somagui's account at CCEI Bank in E.G. for (i) $266,439 on May 24, 2002; and (ii) $1,499,980 on June 28, 2002. In addition, Nguema's Riggs Bank account received additional wires from accounts in his own name at (i) Chase Manhattan Bank for $209,548 on April 25, 2002; and (ii) National Financial Services Corp. for $734,225 on July 8, 2002. In addition, Nguema's account at City National Bank in Los Angeles in the name of TNO Entertainment received three additional wires from Somagui's E.G. bank account: (i) a wire for $199,950 on January 22, 2002; (ii) a wire for $59,980 on June 13, 2002; and (iii) $149,980 on June 19, 2002.

E.   In **2003**, Nguema spent and wired more than **$6,735,216** throughout the world. Specifically, Nguema's account at Riggs National Bank received five wires from Somagui's CCEI account for (i) $299,980 on March 19, 2003; (ii) $1,499,975 on July 11, 2003; (iii) $2,599,985 on July 17, 2003; (iv) $671,679 on August 11, 2003; and (v) $999,975 on September 17, 2003. Additionally, Nguema spent $663,622 on a Maybach 62 automobile in Paris.

F.   In **2004**, Nguema spent more than **$88 million** to acquire numerous personal assets around the world, including a property valued at approximately $80 million in Paris on Avenue Foch, and two properties in Cape Town, South Africa, for $8 million. The value of these three assets alone equaled almost 43 percent of the total gross construction income Somagui had purportedly generated at that time throughout its entire existence.

G.   In **2005**, Nguema spent more than **$11 million** on assets and expenditures, including (i) over $2 million on two 50-foot, high-performance racing boats in Ft. Myers, Florida; (ii) $1 million on a

ten-day yacht cruise around St. Barthelemy in December; (iii) €381,000 on a Rolls Royce; (iv) €82,000 on a Maserati; (v) €1.8 million on renovations and decorations to his Paris home; and (vi) almost €3 million on jewelry and art, including three Piaget baguette diamond-studded watches for €777,400 (approximately $1,010,620) each.  Nguema's expenses for 2004 and 2005 combined ($99 million) amounted to more than 48 percent of the total gross income Somagui had supposedly generated from construction projects at that time throughout its entire existence.

H.   In **2006**, Nguema spent more than **$88 million** on assets and expenditures, including (i) $30 million on the defendant Sweetwater Property; (ii) $38.5 million on a Gulfstream G-V jet aircraft; (iii) €7.34 million in renovations and decorations to his Paris home; (iv) €2.296 million on two Bugatti vehicles; and (v) €1,291,680 on jewelry and art, including a diamond-studded Vacherin Constantin watch for €586,040 (approximately $761,852).  Nguema's expenditures for the period 2004-2006 combined (approximately $187 million) equaled almost 91 percent of the total gross income Somagui had supposedly generated from its construction projects at that time throughout its entire existence.

I.   In **2007**, Nguema spent more than **$10,676,190.42** on assets and expenditures, including (i) €347,010 on a Bentley; (ii) €50,657 on a Peugeot; (iii) €49,078 on a Mercedes; (iv) €1,868,573 on renovations and decorations to his Paris home; (v) €179,400 on jewelry; (vi) €4.4 million on antiques, including an antique cabinet made by André-Charles Boulle for €2,600,000 ($3,380,000); and (vii) $1,713,057.42 on servicing costs related to his Gulfstream.  Nguema's combined expenditures between 2004-2007 (approximately $197,676,190.42) equaled almost 96 percent of the total gross construction income Somagui had purportedly generated at that time throughout its entire existence.

J.   In **2008**, Nguema spent more than **$59,765,405** in assets and expenditures, including (i) approximately $6.8 million on a property in Sao Paulo, Brazil; (ii) $4,533,000 on a painting by Edgar Degas; (iii) $6,424,000 on a painting by Pierre-Auguste Renoir; (iv) $8,905,000 on a painting by Paul Gauguin; (v) $8,905,000 on a

painting by Henri Matisse; (vi) $601,000 on a painting by Pierre Bonnard; (vii) €8,410,000 on antiques; (viii) €5,600,000 on a painting by Edgar Degas; (ix) €364,940 on a Bentley; (x) $280,000 on the pre-design of a $280 million mega-yacht in Germany;(xi) €1,231,880 on jewelry; (xii) $2,038,391.89 on a Bugatti Veyron in California; (xiii) $609,973.29 on a Rolls Royce in California; and (xiv) $380,173.96 on a second California Rolls Royce.  Nguema's combined expenditures between 2004 and 2008 ($257,441,595) equaled more than 120 percent of Somagui's purported total gross construction income generated at that time throughout its entire existence, and exceeded the dollar amount purportedly earned by Somagui during that time period by more than $56 million.

K.      In **2009**, Nguema spent more than **$9,046,425.48** on assets and expenditures, including (i) €2,199,980 on renovations and decorations to his international properties; (ii) €652,174 on 1,403 bottles of high-end wine; (iii) €2,960,000 on art; (iv) €203,320 on jewelry; (v) $609,984.29 on a Rolls Royce in California; (vi) $499,910.45 on a second California Rolls Royce; and (vii) $116,414.74 on servicing costs related to his Gulfstream.  Nguema's expenditures between 2004 and 2009 (approximately $266,488,021.04) equaled more than 100 percent of the total gross construction income supposedly obtained by Somagui from all of its construction projects throughout its entire existence at that time.

L.      In **2010**, Nguema spent more than **$37,618,461.62** on assets and expenditures, including (i) €18,347,952 on 109 items acquired at the auction of Yves Saint Laurent's estate; (ii) €1.9 million on a Bugatti vehicle; (iii) €3,840,180 on high-end wine; (iv) €200,000 on a Ferrari; (v) €1.8 million on renovations and decorations to his properties; (vi) €849,160 on jewelry, including another Vacheron Constantin watch for €432,354 (approximately $562,060); (vii) $2,270,187.50 on various Michael Jackson memorabilia, including some of the defendant assets, and (viii) $460,149.12 on servicing costs related to his Gulfstream.  Nguema's combined expenditures between 2004 and 2010 ($304,106,482.66) equaled more than 113 percent of Somagui's purported total gross construction income obtained at that time throughout its entire existence, and exceeded the actual dollar figure by more than $40 million.

44

M.    In **2011**, Nguema spent more than <u>**$7,620,452.18**</u> on assets and expenditures, including (i) €1,602,671 on renovations and decorations for his properties; (ii) €3,198,928 on jewelry, including a diamond-studded Piaget watch for €980,720 ($1,274,936); (iii) $532,984.12 on the defendant Ferrari in California; and (iv) $494,700 on some of the defendant Michael Jackson memorabilia. Nguema's combined expenditures between 2004-2011 ($311,726,934.84) equaled more than 116 percent of Somagui's total gross construction income purportedly generated at that time throughout its entire existence, and exceeded the actual dollar figure by more than $47 million.

130.  When law enforcement authorities in France inquired into the sources of Nguema's wealth, Nguema refused to provide this information to French police. At present, Nguema is under criminal investigation in France for money laundering, misappropriation and embezzlement of public funds, and misappropriation and embezzlement of corporate funds. On September 28, 2011, the Tribunal de Grande Instance de Paris ("French High Court") in France ordered the seizure of eleven high-end automobiles from Nguema's home on Avenue Foch in connection with their investigation. In February 2012, the French High Court authorized French police to enter and seize the contents of Nguema's Paris home. Shortly thereafter, in April 2012, Nguema was ordered to appear before Judges Roger Le Loire and Rene Grouman of the French High Court. The French High Court sought to question Nguema regarding the source of his wealth and the acquisition of his $80 million Paris home and several luxury automobiles. Rather than comply with the court order, Nguema left France. In or around April 2012, the French High Court issued a warrant for Nguema's arrest and as of the date of filing this Verified Complaint, Nguema has yet to appear before the French tribunal.

///

///

45

### G.   To Funnel and Harbor His Criminal Proceeds Through U.S. Financial Institutions, Nguema Deceived Banks About His Identity and the True Source and Ownership of His Funds

#### a.   Nguema used Eloba to Conceal and Obscure His Criminal Conduct and the Source of His Wealth in Wiring Funds into the United States

131.  In addition to using Eloba to misappropriate public funds, as described above at paragraphs 97 through 112, Nguema also used Eloba to open secret bank accounts in E.G. to obscure, conceal, and launder his ill-gotten gains, and to funnel these funds surreptiously into the U.S. financial system between 2010 and 2013.

132.  Between in or around October 7, 2010 and September 1, 2012, Eloba funneled in or around $3,206,155.37 into the U.S. financial system from a bank account ending in the numbers 01-61 ("Eloba Shadow Account") maintained surreptitiously in Eloba's name at Banco Nacional de Guinea Ecuatorial ("BANGE").

133.  Nguema concealed the existence of the Eloba Shadow Account from Berardi and other Eloba employees.  According to Eloba Witness A, Eloba Witness B, Eloba Witness C and Eloba Witness D, Nguema was the sole signatory on the Eloba Shadow Account.  Eloba personnel only learned of the Eloba Shadow Account's existence after an Eloba officer applied to obtain a line of credit from BANGE in or around 2012 to complete the Mongomo Project.  Upon applying for the line of credit, a BANGE official inquired why Eloba needed additional funds when Eloba possessed ample funds in its accounts.  The BANGE official then showed bank statements for the Eloba Shadow Account to an Eloba officer.  According to the BANGE official, Nguema retained sole signatory control over the Eloba Shadow Account.  This was the first time Berardi and other Eloba personnel learned of the existence of this secret account.

46

134.  As described above at paragraphs 97 through 112, Eloba, a company with fewer than ten full-time employees, never generated any profit between October 7, 2010, and September 1, 2012.  Furthermore, its total gross revenue during this period amounted to less than 1.8 billion CFAs (approximately $3.6 million).

135.  Yet, Nguema funneled in or around $3,206,155.37, an amount equivalent to nearly 90 percent of Eloba's total gross revenue during this same time period, from the Eloba Shadow Account to multiple U.S. financial institutions.  The vast majority of these funds could not have been obtained from Eloba.  As explained above at paragraphs 103 through 108, Nguema only obtained in or around the equivalent of $932,000 from Eloba between October 7, 2010, and September 1, 2012.  But, Nguema wired nearly three times that amount from the Eloba Shadow Account into the United States during this same time period.

136.  Indeed, even prior to Eloba generating any business income in December 2010, Nguema transmitted approximately $406,968.77 from the Eloba Shadow Account into the United States in multiple wire transfers.  These funds could not have come from legitimate business activity because Eloba had not yet generated any commercial income.

137.  Between September 2010 and December 31, 2011, the vast majority of the money in the Eloba Shadow Account came from wire transfers from Somagui.  Eloba possessed no known business or contractual relationship with Somagui.  As explained above at paragraphs 51-55 and 81-96, Somagui served as a receptacle for Nguema's ill-gotten gains.

138.  For instance the Eloba Shadow Account received the following wire transfers from Somagui in or around the following dates:

| Date | Amount |
|---|---|
| September, 2010 | 200 million CFAs (approximately $400,000) |

47

| | |
|---|---|
| October 6, 2010 | 100 million CFAs (approximately $200,000) |
| October 10, 2010 | 500 million CFAs (approximately $1,000,000) |
| October 21, 2010 | 500 million CFAs (approximately $1,000,000) |
| November 10, 2010 | 500 million CFAs (approximately $1,000,000) |
| December 2010 | 100 million CFAs (approximately $200,000) |
| April 5, 2011 | 150 million CFAs (approximately $300,000) |
| May 19, 2011 | 70 million CFAs (approximately $150,000) |
| June 2011 | 100 million CFAs (approximately $200,000) |
| June 30, 2011 | 80 million CFAs (approximately $160,000) |
| August 1, 2011 | 100 million CFAs (approximately $200,000) |
| Sept. 1, 2011 | 50 million CFAs (approximately $100,000) |
| Sept. 2011 | 33 million CFAs (approximately $66,000) |

139. The funds in the Eloba Shadow Account were used to, among other things, pay for Nguema's personal expenses, such as his legal bills in the United States, as well as to acquire and maintain personal assets, including, as explained in greater detail below at paragraphs 197-224, the defendant assets. According to Eloba Witness A, Eloba Witness B, Eloba Witness C and Eloba Witness D, the funds in the Eloba Shadow Account were not used to operate Eloba or to pay for Eloba's business expenses.

140. Specifically, the following wire transfers were sent from the Eloba Shadow Account into the United States:

| Date | Originating Party | Originating Bank | Benef. Party | Benef. Bank | Amount |
|---|---|---|---|---|---|
| Oct. 7, 2010 | Eloba | BANGE | Mecafis Estate Services | Comerica Bank | $150,018.87 |
| Oct. 7, 2010 | Eloba | BANGE | Baute & Tidus LLP | Union Bank of California | $60,018.87 |
| Oct. 7, 2010 | Eloba | BANGE | Consolid. Steamship Agency (Malibu) | Amegy Bank | $65,034.37 |
| Dec. 7, 2010 | Eloba | BANGE | Consolid. Steamship Agency (Malibu) | Amegy Bank | $18,420.54 |
| Dec. 14, 2010 | Eloba | BANGE | James McCaleb & Co. (Pasadena) | Comerica Bank | $35,242 |
| Dec. 14, 2010 | Eloba | BANGE | Lavitech | Washington Mutual Bank | $13,987 |
| Dec. 16, 2010 | Eloba | BANGE | Passione Rossa LLC | Pacific West National Bank | $492,997.99 |
| Dec. 23, 2010 | Eloba | BANGE | Malibu Estate Management LLC | Commerce Bank | $119,987 |
| Jan. 13, 2011 | Eloba | BANGE | Combined Cargo Intern. | Amegy Bank | $33,385.34 |
| Jan. 13, 2011 | Eloba | BANGE | Any Investig. Agency | Washington Mutual Bank | $122,803 |
| Jan. 13, 2011 | Eloba | BANGE | Lavitch | Washington Mutual Bank | $22,342 |
| Jan. 13, 2011 | Eloba | BANGE | Rockin Boxes Global | Washington Mutual Bank | $46,746.07 |
| Jan. 31, 2011 | Eloba | BANGE | Julien | American | $872,112 |

| | | | | | |
|---|---|---|---|---|---|
| | | | Entertain. | Business Bank | |
| Feb. 1, 2011 | Eloba | BANGE | Ferguson Caseorr Paterson LLP | Rabo Bank | $286,487 |
| Feb. 15, 2011 | Eloba | BANGE | Any Investig. Agency | Washington Mutual Bank | $122,803 |
| Mar. 15, 2011 | Eloba | BANGE | Any Investig. Agency | Commerce Bank | $122,765 |
| Apr. 7, 2011 | Eloba | BANGE | Sweetwater Management Inc. | Washington Mutual Bank | $149,987 |
| Apr. 15, 2011 | Eloba | BANGE | Malibu Estate Management | Commerce Bank | $119,987 |
| Apr. 15, 2011 | Eloba | BANGE | Sweetwater Management | American Business Bank | $119,987 |
| Jul. 8, 2011 | Eloba | BANGE | Aloha Inter'l LLP | Citizens Business Bank | $149,922.73 |
| Aug. 29,2011 | Eloba | BANGE | Quinn Emmanuel Urquhart Sullivan LLP | City National Bank | $99,990 |
| Sept. 6, 2011 | Eloba | BANGE | Malibu Estate Management | U.S. Bank | $89,947.99 |
| Sept. 9, 2011 | Eloba | BANGE | Any Investig. Agency | Commerce Bank | $61,842.87 |
| Dec. 19, 2011 | Eloba | BANGE | Quinn Emmanuel Urquhart Sullivan | City National Bank | $114,185.45 |

| | | | LLP | | |
|---|---|---|---|---|---|
| Apr. 10, 2012 | Eloba | BANGE | Any Investig. Agency | U.S. Bank | $61,149.20 |
| May 25, 2012 | Eloba | BANGE | Aloha Internat'l LLC | Citizens Business Bank | $198,476.19 |
| Jun. 4, 2012 | Eloba | BANGE | Ferguson Caseorr Paterson LLP | Rabo Bank | $35,000 |
| Dec. 21, 2012 | Eloba | BANGE | Law Office of Michael J. Berger | First Republic Bank | $115,762.07 |
| Mar. 21, 2013 | Eloba | BANGE | Fisher & Krekorian | Commerce Bank | $150,000 |

None of the entities listed above that received funds from the Eloba Shadow Account possessed a known business relationship with Eloba. Likewise, Berardi and other Eloba employees neither authorized nor knew about any of these transactions.

141.  For instance, one wire for $150,018.87 was sent from the Eloba Shadow Account on October 7, 2010, to Mecafis Estate Services, LLC ("Mecafis") at Comerica Bank. As noted above at paragraph 137, the Eloba Shadow Account received in or around 100 million CFAs (approximately $200,000) from Somagui one day prior to this wire being transmitted into the United States. Mecafis, a California company formed by Nguema's employee, was used by Nguema to open multiple bank accounts in California. The funds in these Mecafis accounts were used to pay for the maintenance and upkeep of the defendant real property. John Doe F, Nguema's former employee, opened — at Nguema's direction – several accounts at multiple banks in California under the name Mecafis. Nguema explained to John Doe F that because banks in the United

States would never open an account for him if they knew he was associated with it, all of these accounts must be opened by third parties – like John Doe F – in the names of various companies – like Mecafis.  As a result, Nguema warned John Doe F not to disclose to U.S. banks Nguema's involvement or association with these accounts.

142.  In addition to paying for the maintenance of the defendant assets, funds were wire transferred into the United States from the Eloba Shadow Account to pay for Nguema's personal expenses, including his legal bills.  For example, on or around August 29, 2011, a wire for $99,990 was transmitted from the Eloba Shadow Account, via Deutsche Bank Trust Co., to the account of Quinn, Emanuel, Urquhart and Sullivan, LLP ("Quinn Emanuel"), a law firm based in Los Angeles, California, at City National Bank.  Quinn Emanuel is a law firm retained by Nguema in the United States.  Twenty-eight days prior to this wire being transmitted, the Eloba Shadow Account received a wire from Somagui for 100 million CFAs (approximately $200,000).  Banking documents state that the payment was for "Pago de factura."

143.  Another wire for in or around $114,185.45 was transmitted from the Eloba Shadow Account, via Wells Fargo Bank, to Quinn Emanuel at City National Bank on December 19, 2011.  Banking documents state that the payment was for "Pago Honorarios."  In the four-month period preceding this wire, the Eloba Shadow Account received 83 million CFAs (approximately $166,000) from Somagui.

144.  A third wire for $115,762.07 was wired from the Eloba Shadow Account to the account of the Law Offices of Michael Jay Berger at First Republic Bank on or around December 21, 2011.  The comments on the wire stated that the funds were "Payment for Legal Fees and Cost//Incurred in Connection with//Forfeiture Action and Department//of Justice Investigation."  On or about December 31, 2012, Berger wrote a check for $115,762.97 to Jones Day, a

Cleveland-based law firm, for "legal bills." In the four-month period preceding this wire, the Eloba Shadow Account received in or around 83 million CFAs (approximately $166,000) from Somagui.

145. A fourth wire for in or around $150,000 was wired from the Eloba Shadow Account, via Bank of America, to the account of Fisher and Krekorian, a California law firm, at Commerce Bank on or around March 21, 2013. Banking documents state that the payment was for "Payment for Technical Juducually Assistance."

146. According to Eloba Witness C, who was familiar with Eloba's operations and business practices, Nguema utilized these Eloba Accounts to conceal the true source, origin and ownership of funds he transmitted overseas from E.G.

      b.    **In Order to Launder His Corruption Proceeds in the United States, Nguema Orchestrated a Scheme to Defraud and Deceive U.S. Banks**

147. In addition to creating secret accounts in E.G., Nguema similarly orchestrated and implemented a scheme to fraudulently open and use bank accounts at financial institutions in California in order to launder millions of dollars in the United States, while concealing his association with the accounts, the source of funds, and his identity, including his status as an E.G. Minister and the son of E.G.'s President.

148. Having acquired the $30 million Sweetwater property in April 2006, Nguema continued to spend more than $100,000 per month to pay for the maintenance and upkeep of his newly acquired 12-acre Malibu estate.

149. As a result, Nguema's associates and employees, including Michael J. Berger ("Berger"), a California lawyer, and John Doe F, a former employee, created companies in California, including Unlimited Horizon, Inc. and Mecafis to

1  defraud U.S. financial institutions regarding Nguema's relationship to accounts
2  opened and the source and ownership of funds he brought into the United States.
3      150.  As part of this scheme, Nguema caused his employees and associates,
4  including Berger, to open bank accounts in California in the names of these
5  companies without disclosing Nguema's ownership of the companies or their
6  funds and concealing his status as a senior foreign public figure ("SFP")[3] and a
7  politically-exposed person ("PEP")[4].  At all times alleged herein, Berger and John
8  Doe F worked as Nguema's agents, and worked under his control and direction.
9      151.  Nguema and his intermediaries, including Berger, then transferred
10 funds received from Nguema into these fraudulently obtained bank accounts in the
11 United States.
12     152.  In opening numerous California bank accounts and using
13 intermediaries' accounts, Nguema and Berger intentionally and deliberately
14 concealed from these financial institutions Nguema's association with these bank
15 accounts as well as his status as a SFP and a PEP.
16     153.  U.S. financial institutions face substantial criminal and civil penalties,
17 as well as significant reputational harm, if they fail to adhere to the requirements
18 of the Bank Secrecy Act, 31 U.S.C. §§ 5311 and other anti-money laundering
19 controls.  These obligations include, among others requirements, to implement (i)
20 due diligence policies and procedures governing high-risk areas such as accounts

21 ───────────────
        [3] An SFP is a current or former senior official in the executive, legislative,
22 administrative, military, or judicial branches of a foreign government, whether or
   not they are or were elected officials; a senior official of a major political party;
23 and a senior executive of a foreign government-owned commercial enterprise.
   Also included in the definition of a senior foreign political figure are immediate
24 family members of such individuals, and those who are widely and publicly
   known (or actually known) close associates of a senior foreign political figure.
25 *See* 31 C.F.R. 1010.65(p).

26     [4] The Federal Financial Institutions Examination Council's Bank Secrecy
   Act Ant-Money Laundering Act Examinations Manual defines a "politically
27 exposed person" as including a "current or former senior foreign political figure,
   their immediate family, and their close associates."
28

of PEPs, including SFPs, and (ii) internal controls for managing accounts of PEPs and SFPs and companies owned by such persons.

1. **Scheme to Launder Funds Through Union Bank of California**

154. For instance, on or around August 28, 2006, Berger opened two Basic Business Checking Accounts in the name of Unlimited Horizon, Inc. at a Union Bank of California ("UBOC") branch on Wilshire Boulevard in Beverly Hills. Bank records show that Berger identified himself to UBOC as Unlimited Horizon's president, and was the sole signatory on both UBOC accounts.

155. Berger concealed material information from UBOC, including Nguema's association with Unlimited Horizon, as well as Nguema's status as a SFP and a PEP.

156. No banker looking at the documents and information provided to UBOC by Berger, could have identified Nguema as being the owner of these accounts, nor could they have identified the account as one affiliated with an SFP and a PEP. Also, by using the tax identification number obtained for Unlimited Horizon, rather than Nguema's social security number, to open these accounts, Nguema and Berger were able to further conceal Nguema's association with these accounts.

157. When UBOC inquired about the purpose of Unlimited Horizon, Berger represented falsely to UBOC that Unlimited Horizon was created so that one of Berger's clients could pay a female employee without the client's wife knowing about it.

158. After opening both checking accounts, Berger emailed Nguema that day informing him that Unlimited Horizon's two checking accounts had been opened at UBOC and that $30,000 of Nguema's funds, which were deposited in Berger's client trust account, were used to fund these accounts.

159.   In addition to the Unlimited Horizon accounts, Berger opened a client trust account at UBOC on or about October 16, 2006.  Berger and Nguema agreed that future wires from E.G. should be sent by Nguema initially to this new client trust account.  From there, Berger agreed to transmit Nguema's funds to Unlimited Horizon's UBOC accounts.  Berger explained to Nguema in an email dated on or about November 1, 2006, that future wires should be sent "to my new client trust account at [UBOC].  I will transfer it from there to the Unlimited Horizon, Inc. General Account.  I will send you a separate e-mail and fax requesting a $200,000 wire transfer and providing wire transfer information for this new account."

160.   Other correspondence between Berger and Nguema further demonstrates Nguema's ownership and control over Unlimited Horizon UBOC accounts.  In an October 21, 2006 email, Berger informed Nguema that he was setting up the UBOC account for online access to provide Nguema "an easy way to check your balance and the payments made on your behalf."  In a November 17, 2006 e-mail, Berger told Nguema that he had "spent all of your money in the [Unlimited Horizon] General Checking Account."

161.   Within three months of opening these accounts, Nguema began wiring hundreds of thousands of dollars into the United States through Berger's client trust accounts at both UBOC and Bank of America ("BOA").  Between November 24, 2006 and June 6, 2007, Berger's UBOC client trust account received eight wires from Nguema, including from Somagui's account at CCEI Bank in E.G., amounting cumulatively to approximately $1,599,419.

162.   Upon receiving these wires in his client trust accounts, Berger withdrew these funds and deposited them into Unlimited Horizon's UBOC accounts in the form of checks and bank drafts.  Between November 29, 2006 and May 11, 2007, Berger deposited seven checks totaling $1,399,485 into Unlimited

Horizon's UBOC accounts, after withdrawing these funds as "cash" from his client trust account.

163.  Berger sent Nguema an email on or about October 16, 2006, confirming that any funds wired to this client trust account by Nguema would, in turn, be transferred to Unlimited Horizon's UBOC accounts.  Specifically, Berger reminded Nguema, "I have spent or transferred to the Unlimited Horizon Accounts all of the funds that you wired to my [client trust] account . . . . Unlike my [client trust] account [at BOA] which is used for many clients, the 2 Unlimited Horizon Accounts are used exclusively for your business . . . ."

164.  UBOC records show that Unlimited Horizon's accounts were used to support, maintain and enhance the Sweetwater property, including, among other things, paying in or around $54,000 per month for home security services; $10,000 per month in electricity bills; $8,000 per month in phone bills; $73,649.95 in property taxes; $6,875 for the installation of a sauna; more than $10,000 for home theater equipment; more than $4,000 for home insurance; more than $12,000 in landscaping fees; more than $36,000 in tree care-related fees; and more than $30,000 per month in payroll for Nguema's household staff, including estate managers, maintenance crews, and housekeepers.

165.  Berger obtained Nguema's consent before disbursing any checks from Unlimited Horizon's accounts.  Berger would make payments from these accounts after receiving a "check request form" signed in Nguema's handwriting authorizing Berger to pay a specific vendor a specified amount.  In an email to Berger from Nguema's then-personal assistant on or about August 8, 2006, she wrote, "Mr. Nguema wanted me to inform you that he does not want you to use or allocate any of Mr. Nguema's funds, either existing or forthcoming, without his written approval."

2.  **Scheme to Launder Funds Through Comerica Bank**

166.  On or about February 6, 2007, Nguema applied to open a bank

57

1 account at Comerica Bank on the Avenue of the Stars in Los Angeles.

2     167. On this occasion, Nguema directed Jane Doe D, an accountant, to

3 open the account in his name and to identify himself as an E.G. citizen to the

4 bank, but he nonetheless concealed from Comerica the fact that he was a PEP and

5 an SFP. When asked explicitly whether Nguema "ever performed important

6 public functions for a foreign state (PEP)?" Jane Doe D answered in the negative.

7 When asked whether Nguema was "closely associated with person(s) who

8 perform public functions for a foreign state (PEP)?" Jane Doe D again answered

9 in the negative.

10     168. Furthermore, instead of identifying Nguema as E.G.'s Minister of

11 Forestry and Agriculture, Jane Doe D claimed that Nguema was not employed and

12 that his source of income was "family inheritance, sale of automobiles . . . [and]

13 trading expensive & custom automobiles." In connection with his family

14 inheritance, Jane Doe D informed the bank that Nguema receives $50,000 per

15 week (or approximately $1.2 million per year) "from France, Spain or England

16 from private funds received re inheritance."

17     169. Once this account was opened, Nguema deposited $158,086.99 in

18 checks into it.

19     170. On or about March 22, 2007, Comerica closed this account after the

20 bank's compliance personnel discovered that Nguema was a PEP and an SFP.

21 The remaining balance of $153,100.99 was provided to Nguema in the form of a

22 bank check that, in turn, was deposited into Berger's BOA client trust account.

23 These funds were again used to pay for Nguema's personal expenses, including

24 maintenance and upkeep of the defendant Sweetwater property.

25     **3.**    **Scheme to Launder Funds Through Citibank**

26     171. On or about June 25, 2007, approximately 13 days after UBOC closed

27 Nguema's accounts, Berger opened another account in the name of Unlimited

28 Horizon at a Citibank branch on Wilshire Boulevard, one block from UBOC.

1   Although during the preceding three years <u>five</u> different banks in California

2   closed <u>twelve</u> different accounts used by Nguema after learning that Nguema

3   controlled or used those accounts to transmit funds into the United States, Berger

4   represented to Citibank that he alone was Unlimited Horizon's president and

5   concealed from Citibank Nguema's association with the company as well as

6   Nguema's status as an SFP and a PEP.

7       172. Furthermore, in opening the Citibank account, Berger made several

8   explicit misrepresentations to mislead Citibank personnel.  Berger fraudulently

9   represented that:

10          (i)     He was the sole shareholder and director of Unlimited
11                  Horizon, a single stockholder corporation, when, in fact,
12                  Nguema was Unlimited Horizon's sole owner;

13          (ii)    Unlimited Horizon was in the business of providing legal and
14                  accounting services when, in actuality, Unlimited Horizon
15                  provided no commercial services of any kind, let alone legal
16                  and accounting services;

17          (iii)   Unlimited Horizon generated $400,000 in annual sales per year
18                  and $100,000 in profit when, in actuality, Unlimited Horizon
19                  made no such earnings;

20          (iv)    Unlimited Horizon had two "suppliers" – Beverly Wilshire
21                  Investment Company ("BWIC") and Jane Doe 2, an associate
22                  at Berger's law office when, in fact, neither BWIC nor Jane
23                  Doe 2 maintained any such relationship with Unlimited
24                  Horizon; and

            (v)     Unlimited Horizon was banking with BOA when, in actuality,
                    Unlimited Horizon possessed no BOA accounts.

25      173. Furthermore, prior to opening this bank account, a Citibank banker

26   explicitly asked Berger:

27

28

(i) whether "any signer/owner (owning 25% or more) [of Unlimited Horizon]. . . is a citizen of a country other than the United States or Puerto Rico?" and

(ii) "If yes, are any of such owners a Senior Public Figure (SPF) (for example, a current or former Senior Public Figure or Senior Official in the executive, legislative, administrative, military or judicial branch of a government) or a close associate/family member of an SPF?"

In response, Berger fraudulently answered "no" to the first question.

174. On or about July 10, 2007, Berger withdrew $100,000 of Nguema's funds from his client trust account at BOA to open Unlimited Horizon's Citibank account. In an email to Nguema on or about July 12, 2007, Berger confirmed, "[A]s we discussed this morning, on July 10, 2007 I went to Bank of America, withdrew $100,000.00 of your money from my Bank of America [client trust] account, purchased a cashier's check for $100,000.00 made out to Unlimited Horizon, Inc. and deposited said cashier's check into the new Unlimited Horizon, Inc. account at Citibank."

175. Over the course of the next five months, Nguema transferred over $1 million directly from E.G. into Berger's client trust account. Berger, in turn, transferred these funds into Unlimited Horizon's Citibank account. Specifically:

(i) On or about July 27, 2007, Nguema wired approximately $199,948.82 in the name of Somagui in E.G. into Berger's BOA client trust account. Berger then withdrew these funds in cash and deposited them in the form of a bank check into Unlimited Horizon's Citibank account;

(ii) On or about August 16, 2007, Berger withdrew $199,908.45 of Nguema's money from his BOA client trust account as cash and deposited these funds in the form of a bank check into the Unlimited Horizon Citibank account;

(iii)    On or about September 11, 2007, Nguema wired approximately $199,934.10 in the name of Somagui in E.G. into Berger's BOA client trust account. Berger then withdrew these funds as cash and deposited them in the form of a bank check into the Unlimited Horizon Citibank account;

(iv)    On or about October 12, 2007, Nguema wired $199,931.82 in the name of Somagui in E.G. into Berger's BOA client trust account. That same day, Berger withdrew $199,896.82 as cash from his BOA client trust account and deposited these funds in the form of a bank check into the Citibank account; and

(v)    On or about November 6, 2007, Nguema wired $169,178.26 in the name of Somagui in E.G. into Berger's BOA client trust account. Three days later, Berger transferred $169,143.26 to the Citibank account from his BOA client trust account.

176.   Citibank records show that the funds in Unlimited Horizon's Citibank account were used to pay for expenses relating to the defendant Sweetwater property, including, among other things, approximately $54,000 per month on the home's security detail, over $9,000 per month on the power bill to Southern California Edison, over $5,000 per month on the home's water bill to Los Angeles County Waterworks, $37,000 on landscaping costs, $3,773 on maintenance for the home's fish tank, $24,700 on outdoor landscape lighting, $7,577 for the "Fish Physician" in connection with the home's Koi pond, $9,600 on audio-video equipment, $1,304 for swimming pool maintenance, and thousands of dollars for home furniture and decorations.

177.   In an email dated on or about December 7, 2007, Berger confirmed with Nguema, "I know that all payments [from the Citibank account] must be approved by you . . . I understand the importance of the principle. This e-mail will reconfirm that I will only pay bills approved by you."

178.   When the Citibank account ran low on funds, Berger contacted Nguema to wire more money from E.G. On or about October 30, 2007, for

instance, Berger emailed Nguema and advised him, "[t]he bottom line is that it is time to send more money to my [client trust] account. I have prepared a bill and wire transfer instructions and attached those conditions."

179. On or about May 20, 2008, Citibank closed Unlimited Horizon's account. When a Citibank banker from the Wilshire Branch telephoned Berger to advise him that this account needed to be closed, Berger neither commented nor raised any questions as to why such a decision had been made. As of May 2008, six banks in California had closed thirteen accounts during the preceding four years after learning of their association with Nguema.

4.   **Scheme to Launder Funds Through BOA and UBOC**

180. Between 2004 and 2007, Nguema transmitted more than $1.5 million dollars into the United States from E.G. through Berger's client trust accounts at BOA and UBOC. These funds were used to pay for Nguema's personal expenses, including the maintenance and upkeep of the defendant assets.

181. By permitting Nguema to wire money into Berger's client trust account, before transferring those funds to Unlimited Horizon's bank accounts at UBOC and Citibank, Nguema and Berger were able to further conceal from financial institutions in the United States Nguema's association with these accounts.

182. Upon receiving funds from Nguema, Berger either (i) transmitted these funds to various bank accounts held in the names of various California corporations used by Nguema to pay his personal expenses, including for the maintenance and upkeep of the defendant assets, or (ii) used the funds to pay Nguema's personal bills directly.

183. Specifically, Berger's BOA account received the following wires from E.G.: (i) $299,933.50 from Nguema on or about August 8, 2005; (ii) $299,923.68 from SOCAGE on or about August 4, 2006; (iii) $199,975.90 from SOCAGE on or about September 26, 2006; (iv) $199,976.17 from SOCAGE on or

about October 20, 2006; (v) $199,948.82 from SOCAGE on or about July 26, 2007; (vi) $199,933.45 from Somagui on or about August 14, 2007; and (vii) $199,934.10 from Somagui on or about September 11, 2007.

184.   After receiving these wires, Berger frequently wrote checks to "cash" and used the funds to purchase cashier's checks that were then deposited in Unlimited Horizon's accounts at UBOC and Citibank.  For instance, Berger (i) on or about October 23, 2006, wrote a check to cash and used the funds to purchase a cashier's check for $199,931.17 that was deposited in Unlimited Horizon's UBOC account; (ii) on or about July 10, 2007, wrote a check to cash and used the funds to purchase a cashier's check for $100,000 that was deposited in Unlimited Horizon's Citibank account; (iii) on or about July 27, 2007, wrote a check to cash and used the funds to purchase a cashier's check for $199,948.82 that was deposited in Unlimited Horizon's Citibank account; (iv) on or about August 16, 2007, wrote a check to cash and used the funds to purchase a cashier's check for $199,908.45 that was deposited in Unlimited Horizon's Citibank account; (v) on or about September 11, 2007, wrote a check to cash and used the funds to purchase a cashier's check for $199,934.10 that was deposited in Unlimited Horizon's Citibank account; (vi) on or about October 12, 2007, wrote a check to purchase a cashier's check for $199,896.82 that was deposited in Unlimited Horizon's Citibank account; (vii) on or about November 9, 2007, wrote a check to purchase a cashier's check for $169,143.26 that was deposited in Unlimited Horizon's Citibank account; and (viii) on or about December 14, 2007, wrote a check to purchase a cashier's check for $230,687.84 that was deposited in Unlimited Horizon's Citibank account.  The funds in Unlimited Horizon's UBOC and Citibank accounts were then used by Nguema to pay for various personal expenses, including the maintenance and upkeep of the defendant assets.

185.   In addition, at other times, Berger wrote checks directly from his BOA client trust account to pay for various personal expenses incurred by

Nguema, including some relating to the maintenance and upkeep of the Sweetwater property. For instance, (i) on or about August 31, 2006, October 4, 2006, and July 6, 2007, Berger paid $56,544, $54,720, and $54,720, respectively, to the Sweetwater property's security service; and (ii) on or about December 10, 2007, Berger paid $169,242.68 in county property taxes for the Sweetwater property from this account.

186. After BOA investigated Berger's use of his client trust account in 2008, BOA closed Berger's client trust account as it "wasn't comfortable" with Berger's use of this account. Likewise, as explained above, UBOC closed Berger's client trust account in June 2007.

### 5. Scheme to Launder Funds Through Wells Fargo Bank

187. On or about March 14, 2008, approximately nine months after UBOC closed Nguema's Unlimited Horizon accounts and Berger fraudulently opened another Unlimited Horizon account at Citibank, Nguema directed his employee John Doe F to open more bank accounts at various banks located on Pacific Coast Highway in Malibu. Specifically, Nguema directed John Doe F to open these account for Nguema's exclusive use and control in the name of Mecafis at various banks, including a branch of Wells Fargo Bank, N.A., located on Pacific Coast Highway in Malibu less than one mile from the Sweetwater property.

188. Nguema provided John Doe F with $2,000 in cash to open this account. No banker looking at the documents and information provided to Wells Fargo by John Doe F in opening this account, could have identified Nguema as being the owner of this account, nor could they have identified the account as one affiliated with an SFP and a PEP.

189. As of about March 14, 2008, when this Wells Fargo account was opened, five different banks in California had closed twelve different accounts associated or controlled by Nguema during the preceding four-year period. Yet John Doe F, at Nguema's direction, did not disclose Nguema's association with

64

1    this account, nor did he disclose Nguema's status as an SFP or PEP.  When John

2    Doe F opened this account, he informed Wells Fargo that he was Mecafis' owner.

3         190.  Over the course of the following seventeen months, eight other

4    signatories cycled through this account for varying periods of time.  These

5    individuals included Nguema's accountants in Pasadena, California; various

6    household employees of Nguema; and a girlfriend of Nguema.  None of these

7    individuals ever disclosed Nguema's association and use of this account, as well

8    as his status as an SFP and PEP, to Wells Fargo.

9         191.  Between on or about April 14, 2008, and March 25, 2010, Mecafis'

10   Wells Fargo account received 23 wires from Nguema in E.G.  In total, these wires

11   amount to in or around $3,980,109.  These wires originated from E.G. bank

12   accounts held by Nguema, SOCAGE, Somagui, and Sofona at three E.G. banks:

13   CCEI Bank, BGFI Bank and Societe Generale Guinee Equatoriale.

14        192.  The funds in this account were used to pay for the maintenance and

15   upkeep of the Sweetwater property.

16        193.  When John Doe F, who originally opened the account, asked Nguema

17   to have his name removed from the account, his name was replaced by John   Doe

18   G, an accountant in Pasadena.  The next day Nguema terminated John Doe F as an

19   employee.

        **6.    Scheme to Launder Funds Through J.P. Morgan Chase
20               Bank**

21

22        194.  Two years after Nguema fraudulently opened the Mecafis account at

23   Wells Fargo, John Doe G opened an account for Nguema's use and control under

24   the name of Sweetwater Canyon, Inc. at a branch of J.P. Morgan Chase Bank,

25   N.A., located on East Colorado Boulevard in Pasadena, California in or around

26   one mile from John Doe G's accounting firm, on October 5, 2010.  John Doe G

27   stated that he was Sweetwater Canyon's president but neither disclosed Nguema's

28   association with this account nor his status as a PEP and a SFP.  The initial

deposit for the account's opening was funded with a check from Mecafis' account at Dominica Bank.  No banker looking at the documents and information, provided to J.P. Morgan Chase by John Doe G and Nguema, could have identified Nguema as being the owner of this account, nor could they have identified the account as one affiliated with an SFP and a PEP.

195.  This account is used to pay for the maintenance and upkeep of the defendant assets, including the Sweetwater property's gas bills, phone bills, water bills, swimming pool maintenance fees, maintenance fees for the property's aquarium, gardening and landscaping bills, legal bills, accounting bills, and the salaries of the Sweetwater property's employees.  This account was also used to pay for, among other things, the insurance for the defendant Ferrari and the storage fees for Rockin Boxes, where the defendant Michael Jackson memorabilia was stored and secured.

196.  The account received several wires from E.G. for Nguema's use including (i) $150,000 in the name of G.E. Port SA in Bata on or about January 20, 2011; and (ii) $149,987 from the Eloba Shadow Account on or about October 22, 2010.  One day prior to receiving the wire transfer from the Eloba Shadow Account, that account received in or around 500 millions CFAs (approximately $1 million) from Somagui.

H.   **Purchase of the Defendants In Rem**

a.   **Purchase of the Defendant White Crystal-Covered "Bad Tour" Glove and Other Michael Jackson Memorabilia**

197.  In August 2010, an intermediary registered Nguema to bid in a live auction of celebrity memorabilia (called the "Legends" auction) taking place on October 9, 2010, in Macau, China (October 8, 2010, in California).  The intermediary advised the auction house by email to "Please make sure that

[Nguema's] name does not appear anywhere, he should be invisible," and to "please make sure that where a name needs to be, my name is there. This is very important."

198. At the "Legends" auction, the intermediary bid on various auction items by telephone from Los Angeles, for Nguema, and was the winning bidder on numerous items of Michael Jackson memorabilia. The auction house prepared two invoices in the name of the intermediary, totaling $1,398,062.50, using the address of the Sweetwater property.

199. When one of Nguema's assistants received the invoices, she instructed the auction house to revise the invoices to indicate that the purchases were being billed to "Amadeo Oluy, Malabo, Guinea Equatorial." These items were shipped to E.G.

200. In December 2010, another auction of celebrity memorabilia was held by the same auction house, this time in Beverly Hills, California. An intermediary came to the auction on Nguema's behalf and successfully bid on the defendant white crystal-covered "Bad Tour" glove and other defendant items listed in Attachment A-1. The total cost of these items was $872,125.00.

201. In accordance with the instructions it had previously received, the auction house prepared invoices that did not list the buyer as Nguema, but instead used another name, with the address Sweetwater, Malabo, Guinea Equatorial. These items were subsequently packed for shipment and delivered to the defendant Sweetwater property.

202. On January 31, 2011, Nguema caused $872,112.00 to be wire transferred from the Eloba Shadow Account to an account at American Business Bank in Los Angeles in the name of the auction house, Julien Entertainment, to pay for the items purchased at the December 2010 auction. In the three-month period preceding this wire transfer, the Eloba Shadow Account received 600 million CFAs (approximately $1.2 million) in wire transfers from Somagui.

Eloba possessed no known business relationship with Julien's Entertainment, and the defendant Michael Jackson memorabilia listed in Attachment A-1 was used for no known corporate or business purpose relating to Eloba. Neither Berardi nor other Eloba personnel authorized or were aware of this transaction.

203. In March 2011, the auction house held another auction, called "Rock & Roll." Again, an intermediary bid on items on Nguema's behalf. Through the intermediary, Nguema purchased the items listed in Attachment A-2, for a total purchase price of $115,000.

204. On March 29, 2011, an employee of the auction house sent her employer an email regarding the invoices for the items purchased on Nguema's behalf asking,

> I assume I need to rewrite the invoices in the same fashion as I've done in prior sales? (putting all lots on one page, adding catalog page numbers and changing the Buyer's name)

205. The invoices were prepared listing the intermediary, rather than Nguema, as the buyer.

206. On April 15, 2011, Nguema caused a net total of $119,974.00 to be wire transferred from his Eloba Shadow Account to the bank account of Sweetwater Management, Inc. at American Business Bank in Los Angeles, California. Sweetwater Management, Inc. was a California company formed by Nguema in or around 2006. The money paid for the items purchased at the March 2011 auction. Ten days before this wire was transmitted, the Eloba Shadow Account received a wire for 100 million CFAs (approximately $200,000) from Somagui. The defendant Michael Jackson memorabilia listed in Attachment A-1 was used for no known corporate or business purpose relating to Eloba.

207. The items listed in Attachment A-2 were transported to the defendant Sweetwater property on or about September 8, 2011.

208.  In June 2011, Nguema again used an intermediary to bid on more Michael Jackson memorabilia at a "Music Icons" auction.  The intermediary successfully bid on items costing a total of $379,700.00.  On or about August 22, 2011, Nguema paid for the items through a wire transfer in the amount of $379,692.00 sent by "Oluy Amadeo" in E.G. to the bank account of the auction house at American Business Bank in Los Angeles, California.  In the three-month period preceding this wire transfer, the Eloba Shadow Account at BANGE received 280 million CFAs (approximately $560,000) in wire transfers from Somagui.  The items purchased by Nguema at the June 2011 auction are listed in Attachment A-3 and were also delivered to the defendant Sweetwater property on or about September 8, 2011.

209.  After acquiring the defendant memorabilia, Nguema stored and maintained some of the defendant memorabilia at Rockin Boxes Storage, a storage facility in the Los Angeles area. In order to pay for these storage and maintenance costs, Nguema wired funds into the United States from E.G.  For instance, in or around January 13, 2011, Nguema caused $46,746.07 to be wired from the Eloba Shadow Account to Rockin Boxes Storage's account at Washington Mutual Bank for the maintenance and storage of some of the defendant memorabilia.  In or around one month prior to this wire transfer, the Eloba Shadow Account received a wire transfer from Somagui for 100 million CFAs (approximately $200,000). The defendant Michael Jackson Memorabilia was used for no known corporate or business purpose relating to Eloba.

b.   **Purchase of the Defendant Real Property**

210.  The defendant real property is located in a gated community in Malibu, California, and at the time of purchase in 2006, it included approximately 12 acres of land overlooking the Pacific Ocean, a 15,000 square-foot main house, a 2,500 square-foot guest house, two gate houses, a pool overlooking the ocean, a putting green, and a tennis court.

1   211.  In approximately February 2006, Nguema reached an agreement to

2   purchase the defendant real property for approximately $30 million.

3   212.  Although Nguema was in Bata, E.G. during much of the negotiations

4   with the seller and the title company prior to closing, Nguema remained actively

5   engaged in these discussions.  According to PSI records, Nguema, for instance, (i)

6   signed in his own handwriting a "Residential Lease After Sale" ("Lease") with the

7   seller, faxing the signed contract to Nagler on April 2, 2006, using John Doe C's

8   General Work office fax line in Bata; (ii) initialed an addendum to the Lease on

9   April 2, 2006, and faxed the document back to Nagler from John Doe C's office

10  fax line; (iii) requested that the title company amend the escrow instructions,

11  using John Doe E's General Work fax line on April 2, 2006; and (iv) signed in his

12  own handwriting the "Amended/Supplemental Escrow Instructions" on April 5,

13  2006, again faxing the document to Nagler from John Doe E's fax line.

14  213.  Nguema paid a total of $30,442,000 into escrow account #LGL-226-

15  1234 at First American Title Company, 520 North Central Avenue, Glendale,

16  California 91203, held at First American Trust FSB in Santa Ana, California, for

17  the purchase of the defendant real property.  These payments were made as

18  follows on or about the following dates, according to the records of the PSI.

19  214.  On February 2, 2006, West Coast Escrow, on behalf of Nguema, wire

20  transferred $900,000 from one of its escrow accounts to First American Title

21  Company's escrow account.  These funds had come from Nguema's unsuccessful

22  attempt to buy a private jet directly from Gulfstream Aerospace Corporation in

23  2005.  When it cancelled the sale, Gulfstream released approximately $20 million

24  plus interest that it had received as partial payment for the plane to Nguema

25  through a United States law firm.  Per Nguema's instructions, the law firm

26  transferred $900,000 of these funds to West Coast Escrow on December 22, 2005,

27  in connection with an earlier attempt by Nguema to purchase the defendant real

28  property.  West Coast Escrow, in turn, executed this transfer into the First

American Title Company escrow account in California in February 2006.

215. From April 5, 2006 through April 26, 2006, Nguema sent five wire transfers, each in the amount of $5,908,400, from Equatorial Guinea to the First American Trust escrow account. The funds were transmitted into the United States from Société Générale de Banque en Guinée Équatoriale ("Société Générale"), where Nguema held a personal account. The total amount of these five wire transfers was $29,542,000.

216. The funds in Nguema's Société Générale personal account that were wired to the First American Trust escrow account originated from an E.G. public treasury account. These public funds were then funneled through Nguema's personal account at Société Générale to the First American Trust escrow account.

217. Added to the $900,000 initial payment into escrow, the total amount paid into escrow was $30,442,000.

218. The total purchase price for the defendant real property was paid in full from funds provided by Nguema.

219. Nguema did not purchase the defendant real property in his own name. On or about February 8, 2006, Nguema caused the formation of a limited liability company called Sweetwater Malibu, LLC, for the purpose of taking title to the defendant real property. Nguema was the sole member of the company at all times, and provided Sweetwater Malibu, LLC with all necessary funds to take title to the defendant real property.

220. In addition, Nguema took steps to conceal the source, ownership and control of the Sweetwater property. For instance:

(A)  Sweetwater Malibu's articles of organization, which were filed with the California Secretary of State on February 8, 2006, make no reference to Nguema anywhere in the document. Instead, Nagler is listed as the company's initial agent for service of process and an unrelated nominee signed the document as the company's purported "organizer."

71

(B)    Although Sweetwater Malibu was required under California law to file a Statement of Information disclosing publicly the name and address of its manager, the type of business it engages in, and the name and address of its chief executive officer, by May 7, 2006, no such statement was filed.  Sweetwater Malibu did not file such a statement until September 25, 2006, after the transaction to purchase the Sweetwater property was completed.

(C)    In obtaining an EIN for Sweetwater Malibu, Nagler's assistant, the same Nagler employee who filed the false EIN application for Sweet Pink, Inc., filed a false EIN application with the I.R.S. for Sweetwater Malibu.  In that application, Nagler's assistant, at Nagler's direction, claimed falsely to the I.R.S. that she was Sweetwater Malibu's "principal officer, general partner, grantor, owner or trustor."  In addition, she claimed falsely to the I.R.S. that she, rather than Nguema, was Sweetwater Malibu's lone member.  No reference is made anywhere in this application to Nguema's involvement and/or association with Sweetwater Malibu.  Again, Nagler dictated information directly into a tape recorder that his assistant then used to complete the relevant I.R.S. EIN application form.

(D)    Nguema required his realtor to enter into a confidentiality agreement barring him from discussing or disclosing Nguema's identity or details and facts relating to the Sweetwater property transaction.

(E)    Nguema also required his realtor not to disclose his identity as the listing agent on the Multiple Listing Service database, which ordinarily records and discloses real estate transactions and the names of the realtors who handled a transaction.

(F)    On April 3, 2006, Nagler recommended that Nguema ask that the escrow company draft the deed so as to "show [Nagler's] office address so that there is no tie in with [Nguema's current residential] address."  Nagler reminded Nguema that, "The deed is a public document.  The other closing documents should [also] go to my address."

(G)   On April 4, 2006, Nguema responded to, and explicitly approved, Nagler's recommendation that the Sweetwater property's deed list Nagler's office address. Nguema signed the letter in his own handwriting and faxed his response back to Nagler using John Doe E's fax line in Bata.

221.   A grant deed was recorded indicating that the seller sold the defendant real property to "Sweetwater Malibu, LLC" on February 27, 2006. However, escrow did not close, and the deed was not recorded, until        April 27, 2006.

222.   After acquiring the defendant real property, Nguema continued to wire hundreds of thousands of dollars into the U.S. financial system from E.G. to pay for the maintenance and upkeep of the property. Nguema utilized his Eloba Shadow Account to transmit multiple wires to his U.S. shell companies, including Mecafis, Malibu Estate Management, and Sweetwater Management, to pay for the maintenance and upkeep of the Sweetwater Property. For instance:

(i)   In or around December 23, 2010, Nguema caused $119,987 to be wired from the Eloba Shadow Account to Malibu Estate Management, LLC at Commerce Bank, to pay for, among other things, the maintenance and upkeep of the defendant real property. During that same month, the Eloba Shadow Account received a wire from Somagui for 100 million CFAs (approximately $200,000). The defendant real property was used for no known corporate or business purpose relating to Eloba;

(ii)   On April 7, 2011, Nguema caused $149,987 to be wired from the Eloba Shadow Account to Sweetwater Management, Inc. at Washington Mutual Bank, to pay for, among other things, the maintenance and upkeep of the defendant real property. Eight days later, in or around April 15, 2011, Nguema caused an additional $119,987 to be wired from the Eloba Shadow Account to Malibu Estate Management, LLC at Commerce Bank, to pay for, among

1   other things, the maintenance and upkeep of the defendant real
2   property.  Two days prior to that first wire being sent from the Eloba
3   Shadow Account on April 7, 2011, that account received a wire from
4   Somagui for 150 million CFAs (approximately $300,000);

5   (iii)   In or around September 6, 2011, Nguema caused $89,947.99 to be
6          wired from the Eloba Account to Malibu Estate Management, LLC at
7          U.S. Bank, to pay for, among other things, the maintenance and
8          upkeep of the defendant real property.  Five days earlier, on
9          September 1, 2011, the Eloba Shadow Account received a wire for 50
10         million CFAs (approximately $100,000) from Somagui.

11         **c.      Purchase of The Defendant 2011 Ferrari**

12         223.  On or about November 11, 2010, Nguema took delivery of the
13   defendant 2011 Ferrari 599 GTO from Ferrari of Beverly Hills.  Nguema caused
14   his forestry company, Somagui, to make initial down payments on his behalf by
15   executing wire transfers of approximately $25,131, $39,912, and $14,929.65 to
16   the account of Ferrari of Beverly Hills at Pacific Western Bank in California in
17   November and December of 2009.  On October 21, 2010, Nguema faxed a wire
18   transfer request from the Sweetwater property to an E.G. bank, requesting that
19   $493,010.99 be wired to the Ferrari dealer at Pacific Western Bank.  Although the
20   signature line on the document reads "Amadeo Oluy," Nguema signed the
21   document in his own handwriting.  On or around December 16, 2010,
22   $492,997.99 was paid via wire transfer from the Eloba Shadow Account to Pacific
23   Western Bank.  On or around 36 days prior to this wire transfer, Nguema's Eloba
24   Shadow Account at BANGE in E.G. received a wire transfer for 500 million
25   CFAs (approximately $1 million) from Somagui.  The defendant Ferrari was used
26   or purchased for no known corporate or business purpose relating to Eloba.

27         224.  The total recorded purchase price for the vehicle was $532,984.12.
28   When the Ferrari dealer realized that Nguema had overpaid by $39,973.13, this

74

money was refunded to Nguema on December 23, 2009, by wiring this amount directly to an account in Mecafis' name at Wells Fargo Bank.  The defendant Ferrari was seized from the Sweetwater property and is currently in the custody of the United States.

## CONCLUSION

225.  As set forth above, despite a relatively modest government salary, Nguema has acquired vast personal wealth in excess of one hundred million dollars through corrupt schemes.  Nguema also has taken significant steps to conceal the source and ownership of his funds and assets.

226.  On information and belief, the approximately $32 million used by Nguema to purchase the defendant assets was derived from funds obtained through extortion, bribery of a public official, the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of E.G., as well as the transportation and receipt of property stolen or taken by fraud.

227.  Similarly, on information and belief, funds obtained through (i) extortion, bribery of a public official, the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of E.G.; (ii) the transportation and receipt of property stolen or taken by fraud; (iii) domestic bank fraud (18 U.S.C. § 1344); and (vii) making false statements to a financial institution (18 U.S.C. § 1014), were used to provide for the enhancement, decoration, maintenance and upkeep of these defendants *in rem*, including paying for the taxes and insurance fees associated with these assets, the payroll of individuals retained to manage and care for the defendant assets, as well as provide for the general security, preservation and safeguarding of these defendant properties.

///

///

# FIRST CLAIM FOR FORFEITURE

## (18 U.S.C. § 981(a)(1)(C))

228.  Paragraphs 1 through 227 above are incorporated by reference as if fully set forth herein.

229.  Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" is subject to forfeiture to the United States.

230.  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(ii) and (iv) to include, among other things, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official";(iii) foreign offenses involving bribery of a public official; (iv) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (v) receipt of stolen money (18 U.S.C. § 2315).

231.  As set forth above, the defendant assets constitute property that constitutes or is derived from proceeds traceable to extortion, bribery of a public official, the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official in violation of the laws of E.G., as well as the transportation and receipt of property stolen or taken by fraud.

232.  The foreign offenses at issue include violations of the following provisions of the Spanish Penal Code of 1968, which are still the law in E.G.: Article 131 (abuse of public office);  Article 196 (expropriation of assets by a public official); Article 198 (taking advantage of official position to exercise a profession directly related to scope of official duties); Article 200 (collection of illegal taxes); Article 202 (demanding payment of unauthorized taxes); Article 385 (prohibiting public officials from  demanding or accepting bribes to perform a crime); Article 386 (prohibiting public officials from demanding or accepting

bribes to perform an unjust act); Article 387 (prohibiting public officials from soliciting improper gifts); Article 390 (prohibiting public officials from receiving improper gifts), Article 394 (prohibiting public officials from stealing public funds); Article 396 (prohibiting public officials from embezzling funds under his care); Article 400 (prohibiting public officials from defrauding the state); Article 401 (criminal conflict of interest by a public official); Article 404 (prohibiting public officials from taking part in for-profit transactions within the limits of their jurisdiction); Article 493 (criminal threats); Article 496 (unlawful compulsion); Article 503 (forcibly requiring someone to sign, grant or quit claim a public instrument or document); Article 514 (theft); and Articles 528 and 533 (fraud).

233.  Therefore, the defendant assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), on the grounds that they constitute or are derived from proceeds traceable to a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE
### (18 U.S.C. § 981(a)(1)(A))

234.  Paragraphs 1 through 233 above are incorporated by reference as if fully set forth herein.

235.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section . . . [18 U.S.C. § 1957], or any property traceable to such property," is subject to forfeiture to the United States.

236.  18 U.S.C. § 1957 imposes a criminal penalty on any person who:

knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

237.  For purposes of Section 1957, "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(ii) and (iv) to include, among other things, (i) foreign offenses involving "extortion"; (ii) foreign offenses involving

"the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (iii) foreign offenses involving bribery of a public official; (iv) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); (v) receipt of stolen money (18 U.S.C. § 2315); (vi) domestic bank fraud (18 U.S.C. § 1344); and (vii) making false statements to a financial institution (18 U.S.C. § 1014).

238.  As set forth above, the defendants *in rem* were the subject of, or traceable to, monetary transactions or attempted transactions involving criminally -- derived property of a value greater than $10,000 and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (iii) foreign offenses involving bribery of a public official; (iv) the transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); (v) the receipt of stolen money (18 U.S.C. § 2315); (vi) domestic bank fraud (18 U.S.C. § 1344); and (vii) making false statements to a financial institution (18 U.S.C. § 1014).  The foreign offenses at issue are as set forth in paragraph 20, above.

239.  The funds involved in these transactions were used to acquire the defendants *in rem* as well as to provide for the enhancement, decoration, maintenance and upkeep of the defendant *in rem*, including paying for the taxes and insurance fees associated with these assets, and the payroll of individuals retained to manage and care for the defendant assets, as well as provide for the general security, preservation and safeguarding of the defendant assets.

240.  Therefore, the defendants *in rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or are traceable to such property.

## THIRD CLAIM FOR FORFEITURE

### (18 U.S.C. § 981(a)(1)(A))

241. Paragraphs 1 through 240 above are incorporated by reference as if fully set forth herein.

242. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

243. 18 U.S.C. § 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> . . .
>
> (B) knowing that the transaction is designed in whole or in part –
>
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

244. For purposes of Section 1956, "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(ii) and (iv) to include, among other things, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official";(iii) foreign offenses involving bribery of a public official; (iv) transportation of stolen money (18 U.S.C. § 2314); (v) receipt of stolen money (18 U.S.C. § 2315); (vi) domestic bank fraud (18 U.S.C. § 1344); and (vii) making false statements to a financial institution (18 U.S.C. § 1014).

245.  As set forth above, the defendant real property and memorabilia were the subject of, or traceable to, financial transactions or attempted financial transactions and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, (i) foreign offenses involving "extortion";(ii) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (iii) foreign offenses involving bribery of a public official; (iv) the transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); (v) the receipt of stolen money (18 U.S.C. § 2315); (vi) domestic bank fraud (18 U.S.C. § 1344); and (vii) making false statements to a financial institution (18 U.S.C. § 1014).  The foreign offenses at issue are as set forth in paragraph 20 above.

246.  Also, as set forth above, the transactions were designed in whole or in part to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful activity, in that, among other things, the nominal purchaser of the defendant real property was Sweetwater Malibu, LLC, and the invoices for the defendant memorabilia were in the name of Nguema's assistant or a different name, rather than the name of the true owner, Teodoro Nguema Obiang Mangue.

247.  The funds involved in these transactions were used to acquire the defendants *in rem* as well as to provide for the enhancement, decoration, maintenance and upkeep of these defendants *in rem*, including paying for the taxes and insurance fees associated with these assets, the payroll of individuals retained to manage and care for the defendant assets, as well as provide for the general security, preservation and safeguarding of these defendant properties.

248.  Therefore, the defendant real property and the defendant memorabilia are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or are traceable to such property.

## CLAIM FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that judgment be entered in its favor and against the defendants *in rem*, and that process issue to enforce the forfeiture of the defendants *in rem*, and that all persons having an interest in the defendants *in rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the defendants *in rem* to the United States of America for disposition according to law, and that this Court grant the United States such further relief as this Court may deem just and proper, together with the costs and disbursements in this action.

DATED: December 12, 2013    JAIKUMAR RAMASWAMY, CHIEF
                                   ASSET FORFEITURE AND MONEY
                                      LAUNDERING SECTION, Criminal Division

DANIEL H. CLAMAN, Assistant Deputy Chief

WOO S. LEE, Trial Attorney
STEPHEN A. GIBBONS, Trial Attorney
Criminal Division
United States Department of Justice


ANDRÉ BIROTTE, JR.
United States Attorney
STEVEN WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

81

## VERIFICATION

I, Brian McCormick, hereby verify and declare under penalty of perjury that I am a Special Agent with Homeland Security Investigations, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, files and records compiled by the Senate Permanent Subcommittee on Investigations, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of Homeland Security Investigations.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this _11_ day of _December_, 2013, at _1:45 pm E.S.T._.


Brian McCormick
Special Agent
Homeland Security Investigations
U.S. Department of Homeland Security

82

ATTACHMENT A-1:

### ICONS AND IDOLS

| Lot No. | Description | Price |
|---|---|---|
| 586 | MICHAEL JACKSON BAD TOUR GLOVE | 275,000.00 |
| 573 | "WE ARE THE WORLD" MTV VIDEO MUSIC AWARD | 60,000.00 |
| 585 | MICHAEL JACKSON STAGE WORN FEDORA | 60,000.00 |
| 621 | MICHAEL JACKSON STAGE WORN FEDORA | 60,000.00 |
| 553 | MICHAEL JACKSON SIGNED FEDORA | 42,500.00 |
| 549 | MICHAEL JACKSON SIGNED THRILLER JACKET | 40,000.00 |
| 650B | M.J. STAGE WORN SIGNED GOLD FENCING SHIRT | 30,000.00 |
| 606 | MICHAEL JACKSON WORN FEDORA | 25,000.00 |
| 556 | MICHAEL JACKSON "GOLD" RECORD AWARD | 10,000.00 |
| 576 | "WE ARE THE WORLD" SIGNED DOCUMENT ARCHIVE | 10,000.00 |
| 575 | "WE ARE THE WORLD" SIGNED ALBUM | 8,000.00 |
| 650 | M.J. NEVERLAND RANCH GOLD & COUNTRY BY | 7,000.00 |
| 580 | MICHAEL JACKSON SIGNED SHEET MUSIC | 6,500.00 |
| 617 | MICHAEL JACKSON SIGNED PHOTOGRAPH | 5,250.00 |
| 624 | MICHAEL JACKSON KATHERINE BAUMANN BAG | 5,000.00 |
| 557 | MICHAEL JACKSON "THRILLER" RECORD AWARD | 4,500.00 |
| 589 | MICHAEL JACKSON SIGNED BAD ERA POSTER | 4,000.00 |
| 635a | M. JACKSON AND TROY AIKMAN SIGNED FOOTBALL | 4,000.00 |
| 579 | MICHAEL JACKSON "PLATINUM" RECORD AWARD | 3,500.00 |
| 588 | MICHAEL JACKSON SIGNED PHOTO | 3,250.00 |
| 558 | M. JACKSON SIGNED "THRILLER" 12-INCH SINGLE | 3,000.00 |
| 584 | M.JACKSON AND PAUL MCCARTNEY SIGNED BAG | 3,000.00 |
| 540 | JACKSON 5 "GOLD" SINGLE AWARD | 2,500.00 |
| 614 | MICHAEL JACKSON SIGNED BANNER | 2,400.00 |
| 616 | MICHAEL JACKSON SIGNED POSTER | 2,400.00 |
| 550 | M. JACKSON SIGNED PHOTOGRAPH FROM DISNEYLAND | 2,250.00 |
| 647 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 2,250.00 |
| 645 | M. JACKSON NEVERLAND RANCH LIFE SIZED SEATED | 2,000.00 |
| 646 | M. JACKSON NEVERLAND RANCH LIFE SIZE INDIAN F | 2,000.00 |
| 648 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE Y | 2,000.00 |
| 539 | JACKSON 5 "GOLD" RECORD AWARD | 1,500.00 |
| 650C | M. JACKSON SIGNED "LIVE AND DANGEROUS" BOOK | 1,500.00 |
| 555 | M. JACKSON "THRILLER" COMMEMORATIVE STATUE | 1,400.00 |
| 623 | M. JACKSON KATHARINE BAUMANN FOOTBALL BAG | 1,400.00 |
| 610 | M. JACKSON SIGNED HISTORY MAGAZINE CUTOUT | 1,300.00 |
| 643 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 1,300.00 |
| 642 | M. JACKSON NEVERLAND RANCH LIFE SIZE FIGURE O | 700.00 |
| 644 | M. JACKSON NEVERLAND RANCH LIFE SIZE WESTERN | 700.00 |
| 603 | MICHAEL JACKSON STATUETTE | 600.00 |
| | SUBTOTAL | 697,700.00 |
| | PLUS 25% BUYER'S PREMIUM | 174,425.00 |
| | TOTAL | 872,125.00 |

83

Attachment A

ATTACHMENT A-2:

## ROCK N ROLL

| Lot No. | Description | Price |
|---|---|---|
| 180 | MICHAEL JACKSON'S PERSONAL MTV MOONMAN | 50,000.00 |
| | PLUS 20% BUYER'S PREMIUM | 10,000.00 |
| | TOTAL | 60,000.00 |
| 152 | M. JACKSON "GOLD" RECORD AWARD FOR "BEAT IT" | 10,000.00 |
| 139 | JACKSON 5 "GOLD" RECORD AWARD | 6,500.00 |
| 164 | M. JACKSON ARTIST OF THE DECADE LIMITED EDITION | 6,500.00 |
| 148 | MICHAEL JACKSON SIGNED THRILLER DISPLAY | 6,000.00 |
| 153 | MICHAEL JACKSON THRILLER RECORD AWARD | 4,500.00 |
| 154 | MICHAEL JACKSON THRILLER DISPLAY | 4,500.00 |
| 147 | M. JACKSON THRILLER COMMEMORATIVE AWARD | 3,000.00 |
| 186 | M. JACKSON CARLITTA COLLECTION FIGURINES | 1,600.00 |
| 185 | M. JACKSON PORCELAIN HISTORY FIGURINE | 600.00 |
| 183 | M. JACKSON CARLITTA COLLECTION FIGURINE | 400.00 |
| 184 | MICHAEL JACKSON WHITE HISTORY FIGURINE | 400.00 |
| | SUBTOTAL | 44,000.00 |
| | PLUS 25% BUYER'S PREMIUM | 11,000.00 |
| | TOTAL | 55,000.00 |
| | GRAND TOTAL | 115,000.00 |

84

ATTACHMENT A-3

| Lot # | Item | Price | |
|---|---|---|---|
| 565 | MICHAEL JACKSON "SCREAM" SHIRT | 60,000.00 | |
| 606 | MICHAEL JACKSON WIG | 60,000.00 | |
| 467 | MICHAEL JACKSON MOTOWN PERF. SHIRT | 51,000.00 | |
| | 20% BUYER'S PREMIUM | 34,200.00 | |
| | TOTAL | | 205,200.00 |
| 585 | MICHAEL JACKSON MILITARY STYLE JACKET | 25,000.00 | |
| 481 | MICHAEL JACKSON "PLATINUM" RECORD AWD | 16,000.00 | |
| 479 | MICHAEL JACKSON "GOLD" RECORD AWARD | 15,000.00 | |
| 525 | MICHAEL JACKSON IN-HOUSE RECORD AWARD | 9,500.00 | |
| 509 | MICHAEL JACKSON "GOLD" RECORD AWARD | 8,500.00 | |
| 484 | MICHAEL JACKSON SIGNED THRILLER NOTE | 7,250.00 | |
| 446 | EPIC PRESENTATION AWARD | 6,500.00 | |
| 458 | EMMY AWARD FOR THE JACKSONS: AMER DRM | 6,500.00 | |
| 486 | M. JACKSON SIGNED PRESENTATION AWARD | 6,000.00 | |
| 488 | MICHAEL JACKSON "GOLD" RECORD AWARD | 5,000.00 | |
| 444 | MICHAEL JACKSON PLATINUM RECORD AWARI | 4,500.00 | |
| 469 | M. JACKSON & P. MCCARTNEY SIGNED PHOTO | 4,500.00 | |
| 474 | MICHAEL JACKSON LIFE MASK | 4,500.00 | |
| 592 | RIAA "PLATINUM" RECORD AWARD | 4,500.00 | |
| 490 | MICHAEL JACKSON IN-HOUSE RECORD AWARD | 4,250.00 | |
| 405 | MOTOWN PRESENTATION RECORD | 3,500.00 | |
| 443 | MICHAEL JACKSON "GOLD" RECORD AWARD | 3,250.00 | |
| 449 | THE JACKSONS "PLATINUM" RECORD AWARD | 2,750.00 | |
| 569 | MICHAEL JACKSON PORCELAIN STATUETTE | 1,600.00 | |
| 403 | MOTOWN RECORD AWARD | 1,000.00 | |
| | SUBTOTAL | 139,600.00 | |
| | 25% BUYER'S PREMIUM | 34,900.00 | |
| | TOTAL | | 174,500.00 |
| | GRAND TOTAL | | 379,700.00 |

85

# EXHIBIT "A"

## LEGAL DESCRIPTION

Real property in the City of Malibu, County of Los Angeles, State of California, described as follows:

PARCEL 1:

A PARCEL OF LAND BEING A PORTION OF RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1 PAGE 407, ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS, SAID POINT OF BEGINNING BEING NORTH 46° 08' 15" WEST 60 FEET FROM ENGINEER'S CENTER LINE STATION 936 PLUS 62.94 AT THE WESTERLY EXTREMITY OF THAT CERTAIN CENTER LINE COURSE DESCRIBED AS NORTH 43° 51' 45" EAST 362.63 FEET IN THE DEED OF THE 80 FOOT STRIP OF LAND FROM T. R. CADWALADER, ET AL., TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 15228 PAGE 342, OFFICIAL RECORDS; THENCE NORTH 43° 51' 45" EAST 189.63 FEET ALONG THE NORTHERLY LINE OF SAID FIRST MENTIONED STRIP; THENCE NORTH 46° 08' 15" WEST 192.92 FEET; THENCE NORTH 31° 32' 55" EAST 214.93 FEET; THENCE NORTH 42° 01' 59" EAST 186.06 FEET; THENCE NORTH 54° 23' 15" EAST 77.65 FEET, MORE OR LESS, TO THE NORTHWESTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO CHESTER A. VOUGHT AND WIFE RECORDED IN BOOK 20254 PAGE 69, OFFICIAL RECORDS; THENCE NORTH 53° 17' 55" EAST 152.26 FEET ALONG THE NORTHERLY LINE OF SAID PARCEL TO THE NORTHEASTERLY CORNER THEREOF; THENCE NORTH 32° 19' 55" WEST 119.27 FEET; THENCE NORTH 46° 58' 55" EAST 28.96 FEET; THENCE 50° 59' 55" WEST 161.73 FEET; THENCE NORTH 62° 09' 00" WEST 123.16 FEET; THENCE SOUTH 60° 48' 00" WEST 21.76 FEET; THENCE SOUTH 29° 12' EAST 75 FEET; THENCE SOUTH 60° 48' WEST 183.01 FEET; THENCE SOUTH 45° 17' 30" WEST 139.76 FEET; THENCE SOUTH 62° 12' 40" WEST 258.81 FEET; THENCE NORTH 44° 07' 06" WEST 158.98 FEET TO THE CENTER LINE DESCRIBED IN THE DEED TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 AS INSTRUMENT NO. 973 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS; THENCE ALONG SAID CENTER LINE AS TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 183.32 FEET SOUTHWESTERLY ALONG THE ARC OF SAID CURVE 171.24 FEET, TANGENT SOUTH 01° 48' 25" WEST 256.65 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE EASTERLY WITH A RADIUS OF 253.04 FEET SOUTHERLY ALONG THE ARC OF SAID CURVE 79.24 FEET; TANGENT SOUTH 17° 30' 35"; THENCE EAST 104.43 FEET, SOUTH 27° 05' 15" EAST 386.93 FEET AND SOUTH 20° 53' 35" EAST 25.83 FEET, MORE OR LESS, TO A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS, SAID LAST MENTIONED POINT BEING ON THE ARC OF A CURVE CONCAVE NORTHWESTERLY WITH A RADIUS OF 1450 FEET AND THE RADIAL BEARING TO SAID POINT BEING SOUTH 22° 47' 36" EAST; THENCE EASTERLY ALONG THE ARC OF SAID CURVE 590.71 FEET; THENCE TANGENT NORTH 43° 51' 45" EAST 12.21 FEET TO THE POINT OF BEGINNING.

EXCEPT ALL RIPARIAN RIGHTS OF SAID LANDS AND ALL MINERALS, OIL, PETROLEUM, ASPHALTUM, GAS, COAL AND OTHER HYDROCARBON SUBSTANCES IN, ON, WITHIN AND UNDER SAID LANDS BUT WITHOUT SURFACE RIGHT TO GO UPON SAID LANDS TO EXTRACT SAID SUBSTANCES AS CONTAINED IN DEED FROM MARBLEHEAD LAND COMPANY, A

06 0927085

CORPORATION RECORDED FEBRUARY 14, 1944 IN BOOK 20657 PAGE 140, OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND CONVEYED TO THE STATE OF CALIFORNIA BY A DEED RECORDED NOVEMBER 16, 1948 AS INSTRUMENT NO. 2085 IN BOOK 28732 PAGE 310, OFFICIAL RECORDS.

PARCEL 2:

A PARCEL OF LAND BEING A RANCHO TOPANGA MALIBU SEQUIT, AS CONFIRMED TO MATTHEW KELLER BY PATENT RECORDED IN BOOK 1 PAGE 407 ET SEQ., OF PATENTS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS AT THE NORTHEASTERLY EXTREMITY OF THE COURSE DESCRIBED AS "NORTH 43° 51' 45" EAST 189.63 FEET" IN THE DEED TO THE MYLES EDWARD CONNOLLY AND WIFE RECORDED IN BOOK 20657 PAGE 146, OFFICIAL RECORDS; THENCE ALONG THE BOUNDARY OF THE LAND DESCRIBED IN SAID DEED TO CONNOLLY AND WIFE; NORTH 46° 00' 15" WEST 192.92 FEET AND NORTH 31° 32' 55" EAST 193.51 FEET; THENCE SOUTH 45° 44' 11" EAST 234.25 FEET TO A POINT IN THE NORTHWESTERLY LINE BEING A CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 2060 FEET, THE RADIAL BEARING TO SAID POINT BEING NORTH 45° 44' 11" WEST; THENCE ALONG SAID NORTHWESTERLY LINE SOUTHWESTERLY ALONG SAID CURVE 14.42 FEET AND SOUTH 43° 51' 45" WEST 173.00 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL MINERALS, OIL, PETROLEUM, ASPHALTUM, GAS, COAL AND OTHER HYDROCARBON SUBSTANCES IN, ON, WITHIN AND UNDER SAID LANDS AND EVERY PART THEREOF BUT WITHOUT RIGHT OF ENTRY, AS RESERVED BY MARBLEHEAD LAND COMPANY IN DEED RECORDED OCTOBER 17, 1944 IN BOOK 21321 PAGE 347, OFFICIAL RECORDS.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND CONVEYED TO THE STATE OF CALIFORNIA, BY DEED RECORDED NOVEMBER 16, 1948 AS INSTRUMENT NO. 2085 IN BOOK 28732 PAGE 310, OFFICIAL RECORDS.

PARCEL 3:

A. AN EASEMENT FOR ROAD PURPOSES TO BE USED IN COMMON WITH OTHERS OVER A STRIP OF LAND 40 FEET IN WIDTH, THE CENTER LINE OF WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEASTERLY EXTREMITY OF THE COURSE DESCRIBED AS NORTH 62° 09' 00" WEST 123.16 FEET IN THE DESCRIPTION OF THE PARCEL HEREIN CONVEYED; THENCE NORTH 62° 09' 00" WEST 123.16 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE NORTHEASTERLY WITH A RADIUS OF 229.33 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE 262.44 FEET; THENCE TANGENT NORTH 03° 25' 05" EAST 36.35 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE WESTERLY WITH A RADIUS OF 136.48 FEET; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE 129.36 FEET TO THE BEGINNING OF A COMPOUND CURVE CONCAVE SOUTHERLY WITH A RADIUS OF 91.02 FEET; THENCE WESTERLY ALONG THE ARC OF SAID CURVE 138.63 FEET; THENCE TANGENT SOUTH 41° 50' 55" WEST 114.41 FEET, MORE OR LESS TO A POINT IN THE CENTER LINE OF THE EASEMENT FOR ROAD AND HIGHWAY PURPOSES 50 FEET IN WIDTH DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS, SAID LAST MENTIONED POINT BEING NORTH 20° 32' 35" EAST 124.79 FEET FROM THE SOUTHWESTERLY EXTREMITY OF THAT

04/27/06

06  0927085

2

CERTAIN COURSE DESCRIBED IN SAID DEED AS NORTH 20° 32' 35" EAST 158.00 FEET.

EXCEPT THEREFROM THAT PORTION THEREOF INCLUDED WITHIN THE LINE OF PARCEL 1.

B. AN EASEMENT FOR ROAD PURPOSES TO BE USED IN COMMON WITH OTHERS OVER A STRIP OF LAND 50 FEET IN WIDTH LYING 25 FEET ON EACH SIDE OF A CENTER LINE DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTER LINE DESCRIBED IN THE DEED TO SANGER W. CRUMPACKER ET AL., RECORDED JANUARY 22, 1944 IN BOOK 20517 PAGE 382, OFFICIAL RECORDS DISTANT THEREON NORTH 20° 32' 35" EAST 124.79 FEET FROM THE SOUTHWESTERLY TERMINUS OF THAT COURSE DESCRIBED IN SAID DEED AS NORTH 20° 32' 35" EAST 158.00 FEET; THENCE SOUTH 26° 32' 35" WEST 124.79 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 206.84 FEET; THENCE ALONG SAID CURVE AND SAID CENTER LINE SOUTHERLY 130.93 FEET TO THE BEGINNING OF A REVERSE CURVE CONCAVE WESTERLY HAVING A RADIUS OF 178.67 FEET; THENCE SOUTHERLY ALONG SAID CURVE AND CENTER LINE 136.89 FEET TO THE BEGINNING OF A COMPOUND CURVE CONCAVE NORTHWESTERLY HAVING A RADIUS OF 487.46 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE 221.52 FEET TO THE NORTHWESTERLY TERMINUS OF THE COURSE IN THE BOUNDARY OF THE LAND ABOVE DESCRIBED AS NORTH 44° 07' 06" WEST 158.98 FEET; THENCE ALONG SAID BOUNDARY AS FOLLOWS:

SOUTH 55° 19' 33" WEST 229.74 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 183.32 FEET SOUTHWESTERLY ALONG THE ARC OF SAID CURVE 171.24 FEET TANGENT SOUTH 01° 48' 25" WEST 256.55 FEET TO THE BEGINNING OF TANGENT CURVE CONCAVE SOUTHEASTERLY WITH A RADIUS OF 235.04 FEET SOUTHERLY ALONG THE ARC OF SAID CURVE 79.24 FEET TANGENT SOUTH 17° 30' 35" EAST 104.43 FEET, SOUTH 27° 05' 15" EAST 386.93 FEET AND SOUTH 20° 53' 35" EAST 25.83 FEET, MORE OR LESS, TO A POINT IN THE NORTHERLY LINE OF THE STRIP OF LAND DESCRIBED IN A DEED FROM MARBLEHEAD LAND COMPANY TO THE STATE OF CALIFORNIA, RECORDED IN BOOK 16845 PAGE 253, OFFICIAL RECORDS.

EXCEPT THEREFROM THAT PORTION THEREOF INCLUDED WITHIN THE LINES OF PARCEL 1.

APN:  4452-017-009 and 4452-019-001

04/27/06

06 0927085

# ATTACHEMENT C

## Penal Code of Equatorial Guinea

### Article 131

Any public official who, abusing his position, compromises the dignity or the interests of the Spanish Nation in a manner not included in this chapter shall be punished with long-term imprisonment and debarment.

### Article 196.

Any public official who expropriates the property of a national or foreigner, outside of the permitted cases and without meeting the legal requirements, shall incur the penalties of suspension and a fine of 5,000 to 25,000 pesetas.

### Article 198

Any Authority or public official who, taking advantage of his position, practices any profession directly related to the sphere of his official authority or involves himself directly or indirectly in private associations or companies with the intent to profit, shall incur debarment and a fine of 5,000 to 250,000 pesetas.

### Article 200

Any Minister who orders payment of a tax not authorized by law shall be punished with permanent debarment and a fine of 10,000 to 500,000 pesetas.

### Article 202

Any public officials who demand, from State, Provincial, or Municipal taxpayers, the payment of taxes not authorized by the respective laws or Councils shall incur the penalties of suspension and a fine of 5,000 to 50,000 pesetas. If such exaction took effect, the maximum of the penalties herein provided shall be imposed. If compulsion or another means of coercion is used, the penalties shall be permanent debarment and the fine herein provided.

Attachment C

## Article 385

Any public official who solicits or receives, on his own or through an intermediary, a gift or contribution, or accepts an offer or promise in exchange for carrying out an act which is related to the duties of his position and which constitutes a crime, shall be punished with short-term imprisonment and a fine equal to or up to three times the value of the gift, without prejudice to the penalty for the crime committed in connection with the gift or promise.

## Article 386

Any public official who solicits or receives, on his own or through an intermediary, a gift or contribution, or accepts an offer or promise in exchange for carrying out an unjust act which is related to the duties of his position and which does not constitute a crime, and who carries out such act, shall incur the penalty of short-term imprisonment and a fine of equal to or up to three times the value of the gift; if the unjust act is not carried out, the penalties of brief imprisonment and a fine of equal to or up to two times the value of the gift shall be imposed.

## Article 387

When the gift is solicited, received, or promised with the intent that the public official refrain from an act which he should carry out in the discharge of his duties, the penalties shall be brief imprisonment and a fine of equal to or up to three times the value of such gift.

## Article 390

Any public official who accepts gifts that may be presented to him in the normal course of duties for his office, or in order to secure a just act that should not be compensated, shall be punished with suspension and a fine of 5,000 to 25,000 pesetas.

## Article 394

Any public official who steals or consents to the stealing by another person of the public funds or property that may be under his control or at his disposal by virtue of his duties shall be punished:

1st    With the penalty of brief imprisonment if the theft does not exceed 2,500 pesetas.

2nd    With the penalty of short-term imprisonment if the theft exceeds 2,500 pesetas and is not greater than 50,000 pesetas.

3rd    With the penalty of long-term imprisonment if the theft exceeds 50,000 pesetas and is not greater than 250,000 pesetas.

4th    With the penalty of long-term imprisonment if the theft exceeds 250,000 pesetas.

The Court shall impose the penalty it deems appropriate of those provided in the preceding numbers if, in its judgment, theft occurred, and the amount thereof is not proven. In all cases, the penalty of permanent debarment shall be imposed additionally.

## Article 400

Any public official who, in the normal course of duties for his position, on a committee related to supplies, contracts, adjustments, or liquidations of public property or assets, acts in concert with the interested parties or speculators, or uses any other artifice to defraud the State, Provinces, or Municipality, shall incur the penalties of short-term imprisonment and debarment.

## Article 401

Any public official who, directly or indirectly, holds an interest in any type of contract or operation in which he must be involved by reason of his position shall be punished with the penalties of debarment and a fine equal to or up to three times the interest he held in the arrangement. This provision is applicable to experts, arbiters, and private accountants, in respect of the property or things in the appraisal, partition, or awarding of which they took part, and to guardians or executors in respect of the property or things belonging to their wards or decedents' estates.

## Article 404

Any Judges, officials from the Office of the Attorney General, military Commanders, or government or economic Leaders, except Mayors, who during the discharge of their duties take part directly or indirectly in speculative, trading, or for-profit transactions, within the limits of their jurisdiction or command, involving objects that are not the product of their own property, shall be punished with suspension and a fine of 5,000 to 25,000 pesetas. This provision does not apply to those who invest their funds in shares of a Bank or of any enterprise or company, as long as they do not hold a position or have direct, administrative, or economic involvement therein.

## Article 493

Anyone who threatens to cause felonious physical or moral harm or property damage to another individual or his family shall be punished:

1st     By a misdemeanor prison term if the threat was made by demanding payment of a sum or imposing any other condition, even if not illegal, and the guilty party was able to achieve his end; and by a period of brief imprisonment if the end was not achieved. The maximum punishment shall be imposed if the threats were made in writing or in the name of real or fictitious entities.

2nd     By a period of brief imprisonment and a fine of 5,000 to 25,000 pesetas if the threat was not conditional.

## Article 496

Anyone who, without being legally authorized to do so, and through violent means, prevents another from doing anything that the Law does not prohibit, or forces him to do something he does not want to do, whether fairly or unfairly, shall be punished by brief imprisonment and a fine of 5,000 to 50,000 pesetas.

## Article 503

Anyone who, through violence or intimidation, and in order to defraud another individual, forces him to sign, grant or quit claim a public instrument or another document shall be punished, as guilty of theft, by the penalty indicated in this chapter.

## Article 528

Any person who defrauds another in regard to the substance, quantity, or quality of the things he delivers to such person pursuant to an obligation shall be punished:

1st    With the penalty of long-term imprisonment if the fraud exceeds 100,000 pesetas.

2nd    With the penalty of short-term imprisonment if it exceeds 25,000 pesetas and is not greater than 100,000 pesetas.

3rd    With the penalty of brief imprisonment if the fraud exceeds 2,500 pesetas and is not greater than 25,000 pesetas.

4th    With the penalty of brief imprisonment if the fraud does not exceed 2,500 pesetas and the defendant previously was convicted of the offense of robbery, larceny, fraud, misappropriation, check floating, or concealment, or tried two times for misdemeanor offenses of larceny, fraud, or misappropriation. *Worded in accordance with Law 3/1967, of 8 April.*

## Article 533

Any person who defrauds or adversely affects another using any deception not provided for in the preceding articles of this section shall be punished with a fine equal to or up to two times the harm he may have caused, but which shall be not less than 5,000 pesetas, and in the case of subsequent violations, with the same fine and brief imprisonment.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Christina A. Snyder _____ and the assigned Magistrate Judge is _____ Alicia G. Rosenberg _____ .

The case number on all documents filed with the Court should read as follows:

## 2:13-CV-9169-CAS (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

December 12, 2013
_____
Date

By  MDAVIS
_____
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

☑ **Western Division**
312 N. Spring Street, G-8
Los Angeles, CA 90012

☐ **Southern Division**
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

☐ **Eastern Division**
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

United States of America

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

One Michael Jackson Signed Thriller Jacket And Other Michael Jackson Memorabilia; Real Property Located On Sweetwater Mesa Road In Malibu, California; One 2011 Ferrari 599 GTO

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)
Woo S. Lee, Trial Attorney, 1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530, Tel: (202) 514-1263, Woo.Lee@usdoj.gov
Steven R. Welk, Assistant United States Attorney, 312 N. Spring Street, 14th Floor
Los Angeles, CA 90012 Tel: (213)894-6166, Steven.Welk@usdoj.gov

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- [X] 1. U.S. Government Plaintiff
- [ ] 2. U.S. Government Defendant
- [ ] 3. Federal Question (U.S. Government Not a Party)
- [ ] 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- [X] 1. Original Proceeding
- [ ] 2. Removed from State Court
- [ ] 3. Remanded from Appellate Court
- [ ] 4. Reinstated or Reopened
- [ ] 5. Transferred from Another District (Specify)
- [ ] 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes [X] No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes [X] No    ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

18 U.S.C. §§ 981(a)(1)(A) and (C)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | [X] 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: **CV13-09169**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned.  This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [x] No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| [x] Yes  [ ] No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [x] Los Angeles | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [x] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [x] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of claims arose: | [x] | [ ] | [ ] | [ ] | [ ] | [ ] |

| C.1. Is either of the following true? If so, check the one that applies: | C.2. Is either of the following true? If so, check the one that applies: |
|---|---|
| [ ] 2 or more answers in Column C | [ ] 2 or more answers in Column D |
| [ ] only 1 answer in Column C and no answers in Column D | [ ] only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the<br>SOUTHERN DIVISION.<br>Enter "Southern" in response to Question D, below.<br><br>If none applies, answer question C2 to the right. ➡ | Your case will initially be assigned to the<br>EASTERN DIVISION.<br>Enter "Eastern" in response to Question D, below.<br><br>If none applies, go to the box below. ⬇ |
| Your case will initially be assigned to the<br>WESTERN DIVISION.<br>Enter "Western" in response to Question D below. ||

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ NO ☒ YES

If yes, list case number(s): CV 11-03582 GW

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)

☐ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____ DATE: December 12, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |